# JUNE TERM, 1889.*

EVA R. BELLES v. WILLIAM A. BURR, SALMON I BEECHER, AND JOHN ALGOE.

*Elections—Qualifications of voters—Right of women to vote for school-district officers.[1]*

1. The qualifications of voters for school officers, or upon questions arising at school meetings, have never been identical with those of electors, as defined in the Constitution.

2. The authority granted by the Constitution to the Legislature to establish a common or primary school system carried with it the authority to prescribe *what* officers should be chosen to conduct the affairs of the school-districts, to define their powers and duties, their term of office, and *how* and by *whom* they should be chosen.

3. While it must be conceded that no person can vote for the election of any officer mentioned in the Constitution unless he possesses the qualifications of an elector prescribed in that instrument, it does not follow that none but *such* electors can vote for officers which the Legislature has the right to provide for, to carry out the educational purposes declared in that instrument.

4. The *mother* or legal *female* guardian of any child included in the census of a school-district, if of the age of 21 years, and a resident of such district for three months next preceding the time for holding any school meeting (therein), is a legal voter upon all questions arising in the district not *directly* involving the raising of money by tax.

Error to Genesee. (Newton, J.) Argued October 19, 1888. Decided July 11, 1889.

Case by a married woman for refusal of defendants, as

---

* Continued from Vol. 75.

[1]For full digest of points decided, see *Table of Cases Reported.*

inspectors of election, to receive her vote for school officers. Defendants bring error. Affirmed, CAMPBELL, J., dissenting. The *facts*, as also the *points* of counsel *passed upon*, and the authorities cited, are stated in the opinion.

*John J. Carton*, for appellants.[1]

*George H. Durand*, for plaintiff.

CHAMPLIN, J.    This action was brought against the defendants as inspectors of election of the Third ward of the city of Flint, to recover damages for refusing to receive plaintiff's vote for the office of trustees of the Union school-district of the city of Flint.

The agreed statement of facts is as follows:

" The plaintiff is a married woman residing in the Third ward of the city of Flint, Genesee county, Michigan, and has resided there continuously for three years last past, and so resided there on the first Monday of April, A. D. 1888, and is 31 years of age.

" That she then was the owner of and had property liable for assessment for school taxes in said Third ward of said city of Flint; that she is the mother of Jennie Belles, a child seven and one-half years of age, who resides with her, and did on said first Monday of April, and had always resided with her, in said ward, and which child was included in the school census of the school-district composed of the entire city of Flint, aforesaid, and of which said Third ward was a part.

" That at the election for city and ward officers in said city, held on said first Monday of April, 1888, said defendants acted as and were the inspectors of election in and for said Third ward; that at said election there were to be voted for and elected for the subdistrict composed of the Third and Fourth wards of said city, one school trustee for the full term, and one school trustee to fill a vacancy; that at said election in said ward said defendants, as inspectors of election, had prepared and had a separate ballot-box to receive

[1] In addition to the points stated in the opinion, counsel for the appellants insisted that the case is ruled by *Mudge v. Jones*, 59 Mich. 165.

all ballots that might be offered at such election for trustees of said subdistrict.

"That on said first Monday of April, at said election, said plaintiff, who resided in said Third ward as aforesaid, offered and tendered her ballot to the said inspectors of election at the voting precinct in said Third ward, for one school trustee for full term, and one trustee to fill vacancy, to be then and there elected for the subdistrict composed of said Third and Fourth wards of said city of Flint. Said ballot was a printed ticket containing the names and office of candidates for said full term and vacancy, and was separate from the ballots for all other city, ward, or other offices. Plaintiff then and there offered to be sworn as to her qualifications as such voter, and as to her residence in said Third ward. Said defendants, as such inspectors of election, refused to swear said plaintiff as to her qualifications as such voter, and refused to receive or count her said vote.

"That before deciding not to swear said plaintiff, or receive her vote, said inspectors of election took advice of reputable legal counselors, and were advised by them that women had no right to vote for such trustees; and that said defendants refused to receive the vote of said plaintiff, or to swear her as to her qualifications as a voter and her residence, in good faith, relying on said legal counsel, and believing it to be correct, and believing that women had no right to vote for such school trustees.

"That the name of said district is 'Union School-district of the City of Flint,' and is composed of the entire city, and is organized under an act of the Legislature of the State of Michigan, being Act No. 316 of the Local Acts of 1877, as amended by Act No. 323 of Local Acts of 1879, and Act No. 349 of the Local Acts of 1885. At said election, no question was involved or to be voted on which directly involved the raising of money by tax."

At the conclusion of the statement of facts, which was received as the evidence in the case, the defendants' counsel requested the court to charge as follows, viz.:

"Under the evidence in this case, the plaintiff is not entitled to recover, and your verdict must be for the defendants."

The circuit judge refused to give the request, and

instructed the jury to find a verdict for the plaintiff, which they did.

The law under which the Union school-district of the city of Flint is organized is Act No. 316 of the Local Acts of Michigan for the year 1877, as amended by Act No. 323, Local Acts of 1879, and Act No. 349, Local Acts of 1885. Section 1 of this act provides that, in addition to the powers and privileges conferred by the act, the Union school-district shall have all the powers and privileges, not inconsistent there-with, conferred upon school-districts by the general laws of the State.

Further sections bearing upon the question read as follows:

" Sec. 3. The school board of said Union school-district shall be constituted of nine trustees, three of whom shall be elected on the first Monday of April in each year, and hold their offices for the term of three years from the first Monday of May next following their election, and until their successors shall have been elected and qualified.

" The term of office of the trustees of said Union school-district heretofore elected on the first Monday of September, 1876, shall terminate on the first Monday of May, 1879; the term of office of the trustees elected on the second Monday of May, 1877, shall terminate on the first Monday of May, 1880; and the term of office of the trustees, elected on the second Monday of May, 1878, shall terminate on the first Monday of May, 1881.

" Sec. 4. For the purpose of the election of trustees under this act, the said Union school-district shall be divided into three subdistricts; the first to consist of that portion of said district lying north of Flint river, the second to consist of that portion of said district lying south of Flint river and east of Saginaw street, and the third to consist of that portion of said district lying south of Flint river and west of Saginaw street: *Provided*, That in said third subdistrict one of said trustees shall be and remain during his term of office a resident of the Fourth ward of the said city of Flint.

" The election of trustees shall be by ballot, and each qualified voter may vote in the ward in which he resides, and not elsewhere, for one person for the office of trustee from his subdistrict. Each trustee shall be a qualified voter and resident of the subdistrict in which he shall be elected.

"At least eight days before the election, notice thereof shall be given by the secretary in the official paper of the city, and, if any vacancy is to be filled, like notice thereof shall be given. The election shall be held at the same time and place, and conducted in the same manner, and by the same officers in each ward, as is provided by the charter for the election of ward officers.

"The inspectors of election in the several wards of the city are hereby required to prepare a separate ballot-box at each of the annual elections provided for in this act, to receive all ballots that may be offered at such election for trustees of said Union school-district from the subdistrict in which the ward may be, and no other officer shall be voted for on such ballot.

"The said inspectors of election shall make the same canvass and public statement of votes given for trustee as for ward officers, and also a certificate of the number of votes given for each person for the office of trustee, which shall be immediately filed in the office of the secretary of the board of trustees; and on the Wednesday next following such election the said board shall meet at the office of its secretary, and ascertain the person who has received the greatest number of votes given for said office in each subdistrict, and declare him elected trustee therefrom of said Union school-district for the term of three years from the first Monday of May then next ensuing; and immediately after such determination said secretary shall cause notice thereof to be given to the persons so elected.

"When a vacancy in the office of trustee shall exist, it shall be filled by election at the same time, and in the same manner, as aforesaid, for the residue of the vacant term: *Provided*, That the voter shall express upon his ballot that the person voted for is to fill vacancy.

"Sec. 5. The qualifications of voters at such elections, or at any school-district meeting, shall be such as are or may hereafter be prescribed by the general school laws.

"If any person offering to vote at an election or school-district meeting shall be challenged as unqualified by any legal voter, the presiding officer shall declare to the person challenged the qualifications of a voter; and if such person shall state that he is qualified, and the challenge shall not be withdrawn, the said president shall tender to him the oath in such cases prescribed in said general law; and every person taking such oath shall thereupon be permitted to vote.

"If any person so challenged shall refuse to take such oath,

his vote shall be rejected; and any person how shall willfully take a false oath, or make a false affirmation, under the provisions of this section, shall be deemed guilty of perjury."

The qualification of voters under the general school law is prescribed by section 5049, How. Stat., and is as follows:

"Every person of the age of 21 years, who has property liable to assessment for school taxes in any school-district, and who has resided therein three months next preceding any school meeting held in said district, or who has resided three months next preceding such meeting on any territory belonging to such district at the time of holding said meeting, shall be a qualified voter in said meeting upon all questions; and all other persons who are 21 years of age, and are the parents or legal guardians of any children included in the school census of the district, and who have for three months, as aforesaid, been residents in said district, or upon any territory belonging thereto at the time of holding any school meeting, shall be entitled to vote on all questions arising in said district which do not directly involve the raising of money by tax."

The oath prescribed by the general school law is found in section 5050, How. Stat., and is as follows:

"You do swear (or affirm) that you are 21 years of age; that you have been for the last three months an actual resident of this school-district, or residing upon territory now attached to this school-district; and that you are the parent or legal guardian of one or more children now included in the school census of this district."

It is insisted by counsel for defendants—

"That under the Constitution of the State of Michigan the plaintiff had not a right to vote as demanded by her; that the Constitution limits the right to become an elector, and to being entitled to vote, to *male* citizens, and to *male* inhabitants, and that until the Constitution is amended by a vote of the people it is not within the power of the Legislature to make women electors and entitled to vote, even for school trustees."

The constitutional provision referred to reads as follows:

" In all elections every male citizen; every male inhabitant residing in the State on the twenty-fourth day of June,

1835; every male inhabitant residing in the State on the first day of January, 1850, who has declared his intention to become a citizen of the United States, pursuant to the laws thereof, six months preceding an election, or who has resided in the State two years and six months, and declared his intention as aforesaid; and every civilized male inhabitant of Indian descent, a native of the United States, and not a member of any tribe,—shall be an elector, and entitled to vote; but no citizen or inhabitant shall be an elector or entitled to vote at any election unless he shall be above the age of 21 years, and has resided in this State three months, and in the township or ward in which he offers to vote ten days, next preceding such election." · Art. 7, § 1.

The Constitution under which we are now living, adopted in 1850, has a separate article, as did also the previous Constitution, entitled: " Article 13. Education."

Sections 4 and 5 of this article read as follows:

" Sec. 4. The Legistature shall, within five years from the adoption of this Constitution, provide for and establish a system of primary schools, whereby a school shall be kept, without charge for tuition, at least three months in each year, in every school-district in the State; and all instruction in said schools shall be conducted in the English language.

" Sec. 5. A school shall be maintained in each school-district at least three months in each year. Any school-district neglecting to maintain such school shall be deprived for the ensuing year of its proportion of the income of the primary school fund, and of all funds arising from taxes for the support of schools."

A brief recapitulation of the provisions of the Constitution of 1835 and the legislation thereunder seems proper in order to arrive at the proper construction to be given to the provisions of the Constitution and legislation invoked by the defendants in justification of their action.

The right of suffrage was conferred by Article 2, § 1, of the Constitution under which Michigan was admitted as a State into the Union, as follows:

" In all elections every white male citizen above the age of

21 years, having resided in the State six months next pre-
ceding any election, shall be entitled to vote at such election;
and every white male inhabitant of the age aforesaid, who
may be a resident of this State at the time of the signing of
this Constitution, shall have the right of voting as aforesaid."

Article 10, § 3, provided as follows:

" The Legislature shall provide for a system of common
schools, by which a school shall be kept up and supported in
each school-district at least three months in every year; and
any school-district neglecting to keep up and support such a
school may be deprived of its equal proportion of the inter-
est of the public fund."

In the Revised Statutes of 1838 a system of primary
schools was established, which provided for the formation of
school-districts. By section 4, chap. 3, tit. 11, it was enacted
that—

" The qualified voters, when assembled pursuant to such
previous notice, and also at each annual meeting, shall choose
a moderator, director, and assessor."

And section 5 prescribes the qualification of voters at such
district meetings as follows:

" Sec. 5.   Every white male inhabitant of the age of 21
years, residing in such district, liable to pay a school-district
tax, shall be entitled to vote at any district meeting."

The Revision of 1849 retained the same provision for the
election of moderator, director, and assessor, but the qualifi-
cation of voters was changed so as to read as follows:

" Sec. 15. Every white male inhabitant of the age of 21
years, residing in the district, and liable to pay a school-dis-
trict tax therein, shall be entitled to vote at any district
meeting; and all persons who are entitled by the laws of this
State to vote at township and county elections, and residing
in said district, shall be entitled to vote on all questions aris-
ing in said district excepting when the raising of money by
tax is in question; and all such persons shall be eligible to any
office in such school-district."

By section 6 of Act No. 195 of the Session Laws of 1847,

the above section was amended by scratching out all after the word "meeting," so that the qualification of voters was left as it was in the Revision of 1838. The law so remained until 1855, when the Legislature passed Act No. 32, entitled—

"An act to extend certain rights and privileges to persons who are tax-payers, but not qualified voters, in school-districts,"—

Section 1 of which reads as follows:

"That the words 'qualified voters,' as used in chapter 58 of the Revised Statutes of 1846, entitled, 'Of Primary Schools,' except in the fifth section thereof, shall be taken and construed to mean and include all taxable persons residing in the district of the age of 21 years, and who have resided therein for the period of three months next preceding the time of voting."

The excepted section relates to the election of moderator, director, and assessor.

Section 1 of the act of 1855 was amended by Act No. 110 of the Session Laws of 1867, and made to read as follows:

"Sec. 1. Every person of the age of 21 years, who has property liable to assessment for school taxes in any school-district, and has been a resident therein three months preceding any district meeting, shall be a qualified voter in said meeting; and all persons who are entitled by the laws of this State to vote at township and county elections, and residing in said district, shall be entitled to vote on all questions arising in said district, when the raising of money by tax is not in question; and all such persons shall be eligible to office in such school-district."

Section 2 of this act repeals section 15 of the primary school law, above quoted. The primary school law underwent a thorough revision in 1881, and the qualification of voters was defined by section 5049, How. Stat., as above quoted.

It requires but a cursory review of the above *résumé* to show that the qualifications of voters for school officers, or upon questions arising at school meetings, have never been identical with those of electors, as defined in the Constitu-

tion. The Legislature has sometimes restricted, and at others extended, the qualifications of voters from those prescribed in that instrument. In the first years of statehood the qualified voters in school-districts were confined to white male residents who were tax-payers. This was varied from time to time by extending it to residents who were not tax-payers, but who had the qualifications of voters under the Constitution, upon all subjects except the election of school-district officers and the raising of money by a tax. Until 1867 no one could vote for school-district officers except white male residents of the district, liable to pay a school-district tax. The change effected by the act of 1867 was to divide the voters into two classes, and to do away with the "white male" qualification, allowing *every* person who had been a resident of the district three months, who had property liable to assessment in the district for school taxes, to vote on *all* questions; and another class who, not having property liable to be assessed, but who resided in the district, and were possessed of the qualifications of voters at town and county elections, to vote *on all questions* not involving the raising of money by tax. This second class must be "white male" persons, as no others could vote at town and county elections. The word "white" was not dropped from the qualification of electors in the Constitution until the amendment to that effect was ratified by a vote of the people in 1870.

The act of 1881, under which the plaintiff claims the right to vote, also confers the right upon two classes,—

1. Upon resident taxable property-owners in the district upon all questions.

2. Upon *all other persons*, residents of the district three months or more, who are 21, who are the parents or legal guardians of children who are included in the school census of the district, on all questions except the question of the raising of money by tax.

It follows that persons may reside in the school-district who possess the qualifications of electors under the Consti-

tution, who are not qualified to vote at school-district meetings for the reason that they do not own property liable to assessment for school taxes.

Viewing the question historically, it is apparent that for 50 years it has never been considered that the qualifications of voters at school-district meetings must be identical with those prescribed in the Constitution as qualifications of electors entitled to vote under that instrument. The authority granted by the Constitution to the Legislature to establish a common or primary school system carried with it the authority to prescribe what officers should be chosen to conduct the affairs of the school-districts, to define their powers and duties, their term of office, and how and by whom they should be chosen.

School-districts are regarded as municipal corporations. *School-district v. Gage*, 39 Mich. 484; *Seeley v. Board of Education*, Id. 486. As such they preceded the Constitution (*Stuart v. School-district*, 30 Mich. 69), and were recognized by that instrument (Const. 1835, Art. 10, § 3; Const. 1850, Art. 13, § 5). But no officer of the school-district is mentioned or recognized by that instrument. The reason is that the whole primary school system was confided to the Legislature, and it cannot be said that the officers of school-districts, chosen pursuant to the system adopted by the Legislature, are constitutional officers. The Constitution provided for no municipal subdivisions smaller than towns, except cities and villages, and it authorized the Legislature to incorporate these. Const. 1850, Art. 15, § 13.

While it must be conceded that no person can vote for the election of any officer mentioned in the Constitution unless he possesses the qualifications of an elector prescribed by that instrument, it does not follow that none but such electors can vote for officers which the Legislature has the right to provide for, to carry out the educational purpose declared in that instrument. With the policy of the Legislature in conferring

the right to vote upon the parent or legal guardian of children embraced in the school census, we have nothing to do. Nor is it any objection that each parent of a single child so included in the school census has the right to vote for such school officers. The statute confers the right upon *persons* in all cases where the question is not the raising of money by tax, and each parent has the same right to vote.

There was no difficulty in exercising the right under the statute in this case. None but school-district officers were included in the same ballot; and the law provided that separate boxes should be kept for the reception of these ballots, so that the difficulty met in the case of *Brown v. Phillips*, 71 Wis. 239 (36 N. W. Rep. 242, 20 Am. & Eng. Cor. Cas. 67), was avoided in this case.

The judgment of the circuit court is affirmed.

SHERWOOD, C. J., concurred with CHAMPLIN, J.

MORSE, J. The general school laws of this State, which govern the qualifications of voters in the Union school-district of the city of Flint, provide that persons may vote at school meetings who are not electors under the Constitution of this State. Every person of the age of 21 years, *who has property liable to assessment for school taxes* in any school-district, and has been a resident of the district for three months before the election, is a qualified voter on all questions.

This includes women and aliens. All other persons 21 years of age, and who are parents or legal guardians of any children included in the school census of the district, and residents for three months before the election, are entitled to vote on all questions which do not *directly* involve the raising of money by tax.

The injustice of this law, and the opportunity given by it to fraud in school elections, have long been open to my observation, and I am not disposed to uphold it, unless it is clearly my duty, under the Constitution and laws of this State, to do so.

No doubt its object was a good one, but its workings have not been promotive of its apparent and probable purpose. It was intended, without doubt, by this statute, to give those equally interested in education, by reason of being tax-payers and the parents and guardians of children, an equal voice in the control of the public and common schools.

But it works unequally. For instance, a man owning thousands of dollars of taxable property in a school-district, and a widower with twelve children, has but one vote in the election of trustees, who are to manage and control the schools and the moneys raised for school purposes, while a man and his wife who have but one child, and not a dollar of property, cast two votes upon this and upon all other questions where the raising of money is not directly involved. And these two persons, parents of but one child, may be aliens with no interests in the welfare of the country save the education of their child. And if they have no interest in the child's education, and they only send it to school because the compulsory education laws compel them to do so, they nevertheless enjoy the privilege of casting two votes upon every vital question pertaining to the schools, except as to the voting of a direct money tax. They may hate our government, as the anarchist hates all government, yet, if they have one child, in school matters they cast two votes to the one that is given the American citizen who has property, and whose children have unfortunately lost their mother.

And by the clause of the law providing that any person who has "property liable to assessment for school taxes in any district" may vote on *all questions*, men and women who are not citizens, and have never declared their intentions to become such, and whose names never appear on the tax-rolls, are in the habit of voting unquestioned at school meetings. If they own a watch, or a ring, or any other personal adornment of value, they are considered to have "property liable to assessment," and these things are sometimes transferred

for the time being to make voters. The result is and has been that, especially in cities, the property owners and the majority of the parents of children are outvoted and controlled in school meetings and school elections by aliens and transients, who have no interest in the cause of education, or in the government of the community where the schools are situated. The opportunities for fraud are made abundant by this clause in the statute, and such opportunities are not always neglected.

The burdens of taxation, as far as school taxes are concerned, are therefore chiefly borne by those who have but little or no voice in the laying of such taxes, or in the disbursement of the moneys gathered by such taxation.

Such a condition of the law will inevitably lead, if it has not already done so, to the formation of rings and combinations of men who will attempt to, and in some cases will, control the schools and the school moneys for their own personal ends and profit.

The Constitution of this State limits the right of suffrage to certain *male* citizens and inhabitants. The male citizen must be over the age of 21 years, and have resided in the State three months, and in the township or ward ten days before he can vote; and the male inhabitant must have the same qualifications, and, in addition thereto, must have resided in the State two years and six months, and declared his intention to become a citizen of the United States six months before the election. Article 7, § 1.

It remains to be seen whether there is any good reason why this right of suffrage should be extended in school matters, and whether the Legislature has any power to so extend it. I can see no reason why a person should vote in school elections that does not apply to the general elections as well.

Attempts have been made at various times to submit a proposition to the people to extend the right of suffrage to women; but the Legislature has not seen fit to do so but

once, when it was overwhelmingly defeated at the polls; the vote in its favor being 40,077, and against 135,957. This was in 1874. There has never been as yet any attempt to give the general right of suffrage to aliens.

It is admitted by the counsel for plaintiff that none but an elector under the Constitution can vote for any officer named in that instrument, but it is contended that the public school system, and its management, and the choosing of the officers to control it, was by the Constitution itself taken out from under the Constitution, and placed entirely in the hands of the Legislature.

The provisions in relation to "education," and upon which this argument is based, are set forth in the opinion of Mr. Justice CHAMPLIN in this case, as are also the provisions of the Constitution of 1835. He also recites the qualifications of voters at school meetings under the laws of 1838 and in the Revision of 1846. It will be seen that the Constitution of 1835 provided that the Legislature should establish a system of common schools. Under such provision the Legislature of 1838 confined the right of suffrage at school meetings to those residing in the district, and who were liable to pay a school tax, but made no distinction between aliens and citizens, if they were males.

In 1846 the right to vote at such meetings was further enlarged, so that male citizens, electors under the Constitution, might vote upon all matters except where the raising of money by tax was in question. In 1847 this extension was stricken out. The law thereafter remained as in 1838, until 1855, and was in force at the time the present Constitution was adopted, in 1850.

Therefore, for 12 years before 1850 the electors at school meetings had possessed different qualifications than those of electors under the Constitution of 1835, and from the beginning of our school system. This must have been known to the framers of our present Constitution, and they must have

acted in reference to it when they ordained Article 12, § 4, of the Constitution of 1850.

In 1855 the law was again amended, so that the "qualified voters" mentioned in the Revised Statutes of 1846 were defined to be "all taxable persons residing in the district, of the age of 21 years, and who have resided therein for the period of three months next preceding the time of voting." In 1867 the act of 1855 was amended, and it was provided that "every person of the age of 21 years, who has property liable to assessment for school taxes," etc., should be qualified voters at such meetings. This was evidently meant to, and does, include women. Under the revision of the school laws in 1881 we have the present law. How. Stat. § 5049. Women have voted at school meetings, more or less, throughout the State, since 1867.

In view of this history of the qualifications of voters at school meetings since the first formation and development of our common-school system in this State, I am constrained to concur with Mr. Justice CHAMPLIN in the opinion that the qualifications of an elector at school meetings have never been identical with those of an elector under the Constitution. And, in view of this fact, it must have been the intention of the framers of the Constitution of 1850, when they provided that the Legislature should establish a school system, following the Constitution of 1835 in that respect, that under such provision the Legislature should have full power to fix and determine the qualifications of voters under such system, and this without regard to the qualifications prescribed by the Constitution for electors at other elections.

To hold otherwise, it seems to me, would be to ignore the fact that the members of the Constitutional convention of 1850 were men of intelligence and practical common sense, and must have known what the practice of the Legislature had been, under the Constitution of 1835, and what it would naturally be, following precedents, under the present Consti-

tution, unless they inserted therein some prohibition against enlarging the right of suffrage, or prescribed what the qualifications of voters should be at school-district meetings.

This they did not do, and the inference is plain to me, and the conclusion to my mind irresistible, that the convention of 1850 meant to confer upon the Legislature the same power that they had exercised in this respect under the Constitution of 1835, and that they did do so by Article 13, § 4.

And, although believing the law as it now stands to be unjust and unequal in its provisions, and of detriment to the cause of education, it is not within my province here to remedy it. If it is constitutional, as I am obliged by the force of inexorable logic to think it is, the Legislature only can give relief against it. The courts have no concern with its wisdom or its results, save to point out, perhaps, as I have endeavored to do, some of its defects and unjust discriminations.

I cannot find in the present case that the trustees of the Union school-district of Flint are made school inspectors in the sense that they are named in the Constitution. If they were I should hold that Mrs. Belles was not entitled to vote for them.

The Constitution names a school inspector as a township officer, whose duties and powers shall be prescribed by law. Article 11, § 1.

Such officer would necessarily have his powers and duties defined by the Legislature in reference to his being a township officer; and few, if any, of the duties now performed by township school inspectors are conferred upon the trustees of the public schools of Flint.

I am therefore of the opinion that the vote of the plaintiff should have been received by the defendants, and the judgment of the lower court in this case is affirmed.

CAMPBELL, J. (*dissenting*). Plaintiff sued defendants, who were election inspectors for the Third ward in the city of

Flint, for rejecting her vote for school trustees. The election was the general city election for municipal and school officers, held on the first Monday of April, 1888. The ballots for school trustees are put in a separate ballot-box, and she only offered to vote for those officials and for no others. She claimed the right to cast such a vote, as a resident for the legal period, being over 21 years of age, having property liable to assessment for school taxes in the district, and having a child included in the school assessment list. She offered to qualify, but was refused. The court below sustained her action, and gave judgment in her favor, which defendants bring before us on exceptions and writ of error.

The city of Flint, like most cities, has its own special school system, and is nominally a single district, divided by law into three subdistricts for election purposes only. Its affairs are governed by nine trustees, of whom three are elected yearly, one in each subdistrict. The third district includes the Third and Fourth wards, and one trustee is required to be a resident of the Fourth ward. Each voter is required to vote in his own ward for a trustee of his subdistrict. The election is governed in all respects in the same way as for the other city officers, except that a separate ballot-box and separate ballot must be used for trustees.

The trustees elect yearly from their own number a president, secretary, and treasurer, who, except as otherwise declared, have the respective powers of moderator, director, and assessor of school-districts. The act leaves it in some doubt whether the trustees or these three of them are made school inspectors of the district with the powers and duties of inspectors of townships, and with the further powers, as to teachers, possessed by superintendents of schools. The powers expressly given to the whole board cover most of the powers of inspectors. The trustees are empowered to fill all vacancies in their own number. They are also authorized to appoint a city superintendent, to determine the number of

schools and the time for the annual commencement of the schools, to hire all necessary teachers and fix their compensation, to classify and grade the schools, and fix terms of admission, and assign the scholars to schools and departments, to fix courses and adopt books, to maintain a high school, to make all rules and by-laws, to fix and collect tuition fees of non-residents, to locate and change school sites, to determine, up to 2 per cent., the amounts to be raised for ordinary and incidental expenses in addition to the other school funds, and some other less important functions.

A school meeting is to be held annually, and also special meetings may be called for specific purposes. The statute makes the annual school year begin July 1, and the fiscal year close March 15. The only things required to be done at this meeting are the determination whether the schools shall be taught by male or female teachers or both, and the time schools shall be taught, which must be not less than nine months. The trustees may determine these matters, if not fixed at the annual meeting. Upon notice, and not otherwise, the voters at the meeting may vote to raise by tax moneys to buy lots and build and furnish school-houses, and may authorize bonds for that purpose, to pay money borrowed therefor, or to take up old bonds. This power of providing for lots and school-houses and of obtaining loans is apparently the only power which cannot be exercised by the trustees.

Section 5, which is one of the few sections which has not been changed since 1877, is as follows:

"The qualifications of voters at such elections, or at any school-district meeting, shall be such as are or may hereafter be prescribed by the general school laws."

The remainder relates to challenging voters, and swearing in votes, and refers to the general laws.

In order to understand some rather blind provisions, it is

necessary to notice how the statute now in force obtained its present shape.

Prior to 1877 the statutes referring to this district made one Union school-district, with trustees, out of existing separate districts. But Act No. 309 of 1867 (2 Laws of 1867, p. 258), school-districts 1 and 3 of the city of Flint were consolidated under the title of "Union School-district of the City of Flint," with the usual district powers. At the annual school meeting in September the voters were to elect six trustees, to be classified so that two new ones should be selected each year. These trustees were to select from their own number a president, secretary, and treasurer yearly, whose powers were the same generally as those of moderator, director, and assessor, except as modified, and who were to be *ex officio* school inspectors. These three officers, however, were given none of the joint powers of a district school board, all of which, with much more, devolved on the trustees, as did the important functions of school inspectors. It is difficult to see what remnant of power was left to them, either as officers acting jointly, or as school inspectors. The qualified voters at the school meeting had substantial control of the taxes, and could authorize loans, and make the schools free to residents. Beyond this the power was vested in the trustees. The act was a modification of the graded school-district, except that it was fixed by statute, instead of by district action.

In 1871 the district was changed so as to include the Second, Third, and Fourth wards of Flint. 3 Laws of 1871, p. 101.

In 1872 (Laws of 1872, p. 48), without changing its name, this district was made to include the whole of the city of Flint, and parts of the outside townships of Flint and Burton. The number of trustees was increased to nine, to be chosen at the annual meeting, and so divided as to have three chosen each year after the first. Three trustees were

always to reside north of Flint river, and six south of it. No very great difference was made in the respective powers of the board and the meeting, but special provision was made for the location of the high school.

In 1877 a law was passed reorganizing this same district, and repealing the former laws. Laws of 1877, p. 301. This law, which made no change in boundaries, provided for making three subdistricts for election purposes, and for holding elections of trustees at such places as the board should determine on the second Monday of May in each year. These elections were to be presided over by trustees as inspectors, who were to be qualified voters and residents of their subdistricts, and they made their own canvass, and declared the result, which was final. It was in this connection that section 5 was included, and it in terms, which remain unchanged, makes the *presiding officer* the person to decide upon the reception of challenged votes. The district corresponded with no legal subdivision of territory; and the elections, which were by ballot, were all managed by district officials, and not by ward inspectors.

In 1879 all but three of the sections of the act of 1877 were materially changed. For the first time the body of the act strictly corresponded with its title, and confined the district to the city of Flint, with which it was made identical. The fiscal year was changed so as to end in March, instead of August, and the election was to be at the annual city charter election in April, and under the control of the city inspectors of election, and the official terms of service of the school trustees were to end on the first Monday of May, instead of the second. An annual meeting is provided for on the third Monday of May, for the purposes before referred to, all of which, as before stated, are left with the trustees, unless the meeting acts on them, with the single exception of loans, and of taxes for lots and school-houses and furniture.

An amendment in 1885 required one trustee to be chosen and maintained in office residing in the Fourth ward.

The general school laws do not provide for the intervention of any voters with special qualifications, except at school meetings, and the only school meeting now provided for in the city of Flint is entirely separate from any popular election, and is held, like all school meetings under the general law, under the immediate control of the school authorities. When the law of 1877 was passed the district, although called the "Union School-district of the City of Flint," was not so in fact, but included outside territory in townships, and was therefore not coincident with any of the ordinary municipal subdivisions, either of city or township. Some questions readily suggest themselves concerning the effect of this departure in regard to the operation of both constitutional and legal provisions. It was apparently the idea of those who framed the law of 1877 that, as the district described was a territory by itself, the elections of trustees referred to in the act were equivalent to district meetings. However this may be, it is evident that the act trenched somewhat on the constitutional provision for township school inspectors, elected by the body of the township. It is certain that school inspectors, in the proper sense of the term, cannot be chosen to act in townships except by ordinary citizen voters. And the laws concerning graded and high schools have always recognized the inspectors of towns and cities as distinct from such district officers as are elected or otherwise chosen at annual meetings. Where a city has a system of its own, the laws have always recognized the city board as a board of inspectors, and these boards have always had powers analogous to those of town inspectors, but much more extensive.

Whatever difficulties may have arisen from the mixture of jurisdictions previously disappeared in 1879, when the city was made the sole territory of the district. And from that

time on the election of the board of trustees has been had at the usual city elections, under the management of the ordinary city authorities, and the school authorities have had nothing to do with it. How far school-district meetings can be put under different voters from general elections is a question quite separate. Our laws have been in some apparent confusion on this subject for many years, and much of this has arisen from introducing laws from other states, whose system both of voting and of levying school taxes differs from ours, and from at least occasional oversights of constitutional provisions. It is one of the misfortunes of legislation that many very well-intentioned and otherwise enlightened persons do not appreciate the fact that there cannot be any close uniformity of laws among states that have not the same history and constitutions, and that it is never safe to borrow a foreign law without adapting it to the rest of our legal system.

The Constitution of 1850, by Article 7, § 1, provides who shall be electors and entitled to vote, and is, according to its terms, applicable " *in all elections.*" It enlarged the privileges given under the former Constitution to persons who reside here two years and six months, and declare their intention six months before an election, who are not fu'l citizens of the United States. Except in war, all voters must vote in the township or ward where they reside, and all elections are required to be by ballot, except for such township officers as are allowed to be chosen otherwise. Section 2. It provides for the election in cities and villages of judicial officers, but allows other officers to be elected or appointed, as the Legislature shall see fit. Article 15, § 14.

If this language does not cover all municipal elections, it would require some ingenuity to find out what it does cover. There is otherwise no constitutional safeguard whatever of the local rights and liberties of a very large share of the inhabitants of the State. The power of local administra-

tion and regulation which may be allowed to cities and coun-
ties is vested in those corporations as such, and it cannot
authorize the Legislature to change the right of suffrage.
If it did, it would reach counties as well as cities.   But it
will not bear any such meaning.   Moreover, cities have
elected judges and justices who cannot be in .office without
election, and who perform functions precisely like those else-
where.   The city is represented on the board of supervisors,
who are, except in Wayne county, the same everywhere.   The
city ward is the constitutional place of election.,  To import
into the Constitution power to enlarge suffrage for one offi-
cer must reach all officers.   School officers are not put by the
Constitution on any peculiar footing

When an election for any local officer is required by law,
the Constitution declares who shall be qualified to act as
electors.   The election of school inspectors by townships is
expressly provided for in the article on townships.   And
from the formation of the State, as ever since the organiza-
tion of the Northwest Territory, the schools have been treated
as quite as necessary a part of municipal government as any
other part of its machinery.  The school lands were, until other-
wise arranged on the admission of Michigan into the Union,
the property of the townships containing them, and the terri-
torial school laws provided for the election in each  township
of trustees to take charge of these lands as soon as  it should
contain 20 electors.   Laws of 1828 (2 Terr. Laws, 695).   By
the Laws of 1827 (2 Terr. Laws, 473), the townships as such
were to provide for schools.

The act of Congress of 1823 (3 Laws U. S. 769), which
first provided for a popular government, prescribed in express
terms the qualifications of voters " at any public election in
the said territory " to be such as had been ;previously fixed by
a law of 1819 authorizing the election of delegates to
Congress (3 Laws U. S. 483).   This qualification was that
every free white male citizen over the age of 21 years, who

had resided in the territory one year before an election, and paid a county or territorial tax, should be a voter. It was always assumed that this governed townships and cities in their elections.

In the earliest city charter of Detroit, before any general election system, provision was made that the city should provide for education (4 Terr. Laws, 90), and from the earliest time it has been a single school-district under its own school board, elected like all other city officers. In 1833 the school laws governing cities and townships were carefully recast, and the identification of education with the municipalities, as such, was more clearly defined than ever. 3 Terr. Laws, 1012, 1238.

In some of the older states the school boards never represented anything but taxable inhabitants, and no taxes were laid except against residents. But in Michigan taxes have always been levied against the same persons and property taxable for public purposes generally, and non-residents have been compelled to bear their full share, theoretically, and sometimes a good deal more, practically. That for public purposes all persons are represented by the constitutionally authorized voters of the State is very well settled. But taxation is one of the highest attributes of sovereignty, and that cannot be held by any class of men or persons except as depositaries of that prerogative directly or by representation. That representation can only be the direct or indirect result of an election, and the Constitution has declared who, and who only, may vote at an election.

It has been held by this Court on several occasions that every school-district is a municipal corporation. *School-dist. v. Gage*, 39 Mich. 484; *Tibbals v. Board of Education*, Id. 635. And in *Board of Education v. Detroit*, 30 Mich. 505, its public character was recognized as independent in its range of powers from the other authorities in the same territory, as co-ordinate in representation.

The close relation between the educational system and the general municipal system has been exemplified in various ways. In *Hatheway v. Sackett,* 32 Mich. 97, it was held to be within the general powers of a village to accept a gift or devise for the purpose of maintaining a high school, as in *Maynard v. Woodard,* 36 Mich. 423, the same ruling was made in regard to the power of a school-district to accept a provision by will for a district library, requiring no further legislation so long as it involved no pecuniary burden. And in *Hathaway v. New Baltimore,* 48 Mich. 251 (12 N. W. Rep. 186), which involved the same bequest referred to in *Hatheway v. Sackett,* it was held that the village corporation could lawfully make use of an auxiliary corporation as its own corporate agent, having facilities to carry out the corporate purposes of the village for school work. It was pointed out in this case that there is no constitutional objection to having corporate as well as individual agencies in aid of municipalities, to do such work as can best be done in that way, and has not been intrusted to any other agency within the same territory. See, also, *Butler v. Detroit,* 43 Mich. 552 (5 N. W. Rep. 1078), and *People v. Hurlbut,* 24 Id. 44, where it was also held that municipal officers must either be elected by the people or appointed by the municipality itself, acting through its elected functionaries. And in *Attorney General v. Detroit Common Council,* 58 Mich. 213 (24 N. W. Rep. 887), it was held that the elective franchise cannot be changed in any part of the State, but must be uniform.

It was held in the same direction in *Robertson v. Baxter,* 57 Mich. 127 (23 N. W. Rep. 711), that the essential qualities of townships are fixed by recognition in the Constitution, and cannot be changed, and that public burdens cannot be laid under the Constitution except by persons chosen by the community in which the work is to be done, and no others.

In *Scrafford v. Gladwin Supervisors,* 41 Mich. 647 (2 N. W. Rep. 904), it was held that two similar municipalities

could not occupy the same territory. This was in conformity to a settled line of decisions, earlier and later, to the same effect. Thus, in *People v. Geddes*, 3 Mich. 70, it was decided that a township justice was regarded as having removed from the township as soon as his place of abode was brought within a city. In *Township of Saginaw v. School-dist.*, 9 Mich. 541, it was held that including any part of a school-district within a city severs it from the rest of the district. A similar principle was applied in *People v. Ryan*, 19 Mich. 203, to the effect of creating a new township in cutting off a school-district. In *People v. Hatch*, 60 Mich. 229 (26 N. W. Rep. 860), where an act to create a school-district made its boundaries go beyond those given to Bay City by its charter, it was held that the purpose to create a city district confined the district within the city limits, and it could not exceed them.

The same principle which treats the school system as only a co-ordinate branch of the same municipality has been applied in more than one way. As already suggested, the practice has been general of having a distinct school government in cities, adjusted to city conditions. In giving these city school acts, they are generally made complete in themselves, and, when not so, are nevertheless very different in their main features from the township school boards and officers in matters of administration. But in *People v. Detroit Board of Education*, 18 Mich. 400, it was held that an amendment of the general school law, requiring colored pupils to be received on the same footing with others, was applicable in Detroit, and abrogated the power given by the Detroit school act to create separate colored schools, although no reference whatever was made to it in the statute. And the substantial unity of the State school system was in that case very distinctly asserted.

But this has been shown more effectually, perhaps, in regard to the library funds. By the Constitution of 1850 it

was provided that the Legislature should provide for the establishment of at least one library in each township; and all fines assessed and collected in the several counties and townships for any breach of the penal laws shall be exclusively applied to the support of such libraries. Article 13, § 12.

Nothing is said in that section about cities, and nothing about school boards, although the article is on education. But it so happens that all of the litigation which we have had in this State to reach the library fine moneys has been in the interest of city school boards, and it has been held in this, as in other cases, that all municipalities in the State were meant to be covered by the rule, and that cities were included in the class named as townships. *Board of Education v. Wayne Co. Treas.*, 8 Mich. 392; *County of Wayne v. City of Detroit*, 17 Id. 390; *Treas. of Wayne Co. v. Controller of Detroit*, 18 Id. 445.

The Legislature, in providing for the custody of libraries, placed them in the hands of the township boards of inspectors and the city boards of education, recognizing these bodies as proper representatives of the municipalities for the purpose; and this Court held, in *McPharlin v. Mahoney*, 30 Mich. 100, that the library money must be paid over to the board of school inspectors of the township, and not kept by the other ordinary town officials.

In 1879 a constitutional amendment was adopted, which was ratified at the next general election, whereby section 12 of article 13 was somewhat modified by allowing the township boards and the city boards of education to use these moneys for school purposes as well as for libraries. This section recognizes the city boards of education as the public representatives of cities for these purposes, and as the only city authorities to act in the matter. Since that amendment, even if there had been any ambiguity before, the city boards of education are as distinctly recognized constitutional bodies

as any other elective bodies. There is no city in the State where the board of education has not power to affect the property of non-residents as well as of residents, by public burdens; and under the Constitution all powers of government must come from the electors made such by the Constitution itself. The board of city school authorities is a body having a larger control than township boards. It has all of their powers, and more, and it is by the Constitution made the correlative body to the township board. It cannot be questioned that the election of township inspectors is one within the express terms of the Constitution. Neither can it be questioned that the municipal authorities of cities must have their source of election in the constitutional electors. There can be no conceivable distinction in principle between the two.

The school laws undertake to give certain powers to taxpayers and some others who are not electors in matters to be passed on at school-district meetings. They have never attempted to authorize them to vote for the township boards, as they could not. The only meaning which can be given to the clauses in the act before us is to make the additional voting qualification confined to electors when voting at school meetings.

Whether it is competent to make any other rule in regard to school meetings we need not now decide. But there has never been any consistent line of statutes recognizing any general power at even school meetings. In the Constitutional convention of 1850, when it was urged on the convention that the elective franchise should be extended to persons not citizens of the United States, it was assumed in the debate, and no one gave any hint to the contrary, that the clause concerning electors, would apply in school elections of all sorts.

At the time when the section numbered 5 in the Flint school law was adopted, the only law in existence which attempted to put power in the hands of any but legal elec-

tors was a statute of 1855 and its amendments, found in the Revision of 1857, § 2388, in its original shape, and in the Revision of 1871, as amended, in section 3705.

By section 5 of the school law, as existing up to 1881, the district officers were required to be elected by "the qualified voters of such district." The Legislature of 1855 passed—

"An act to extend certain rights and privileges to persons who are tax-payers, but not qualified voters, in school-districts."

This was at least a distinct legislative recognition of what the words "qualified voters," repeatedly occurring in the general school law, meant at that time. This law declared that henceforth, except as applying to the fifth section of the general school law, the term "qualified voters" should include all taxable residents of three months over 21 years old. Section 2 of this statute provided that, in case no election of school officers was had in the district, the town board of inspectors should appoint officers from among the male resident tax-payers over 21 years. This statute evidently regarded the constitutional provision concerning elections as applying to district officers, and the only purpose mentioned in the title was to give privileges to tax-payers who were not by the statute itself treated as qualified voters. As nothing can be brought into a statute by amendment which is not covered by the title, it is certainly at least doubtful whether the subsequent amendments, which attempted to put resident voters who were not tax-payers on a worse footing than tax-payers, could be sustained, even if the Legislature had power to pass them under a good title. But, however this may be, the law in existence when section 5 of the Flint statute was passed confined voting by persons not constitutional electors to school meetings, and nothing else, and such is its proper legal effect. It has never been changed, and the general school law in this respect goes no further.

Plaintiff had no right to vote for members of the board of education, and the judgment should be reversed.

LONG, J., did not sit.