# CHARLESTON.

Schmulbach, Park and Frissell *v.* Speidel, Menkemeller, Kreiter and Ritz.

Submitted September 12, 1901.   Decided December 18, 1901.

1. Mandamus—*Restoration to Office.*

   *Mandamus* lies to correct an improper amotion from office and to restore the full enjoyment of his franchise a person who has been improperly deprived thereof; and when one has been wrongfully deprived of his office by the illegal appointment of another, the writ lies to compel his restoration, though the person appointed in his stead be in possession *de facto.*   (p. 560).

2. City Council—*Quorum—Refusal to Vote—Election of Officers.*

   When a city council is composed of two bodies, called branches, a majority of each of which is necessary to a quorum, which by law are required to meet in joint session at the first meeting after the regular charter election, or as soon thereafter as practicable, and elect certain city officers, and at such a regular meeting fewer members than a quorum appear in each branch, and the charter empowers a smaller number than a quorum to adjourn from time to time and compel the attendance of absent members, and in pursuance thereof the council had theretofore provided by ordinance that such smaller number may order the city sergeant, or any of his deputies, to arrest the absent members, or any of them, and cause them to appear forthwith at the place of meeting, and there to remain until the meeting adjourn or leave of absence be given, and had also previously provided by ordinance that the first branch, upon notice by messenger from the second branch, shall proceed in a body to the chamber of the second branch and proceed to elect officers, a quorum of each being present; and such smaller number than a quorum so meeting do cause the absent members to be so arrested and compelled forthwith to attend, and before any adjournment in either branch is had, the second branch, by messenger, gives such notice and thereupon the presiding officer of the first branch and a minority of its members proceed willingly, and the others under compulsion, into the chamber of the second branch and the election of officers is there proceeded with, and a majority of such first branch refuse to vote in such election, but a majority of all the members in such joint session do vote for the persons elected, such election is valid. (pp. 561 to 564).

Error to Circuit Court, Ohio County.

Action by Henry Schmulbach and others against Joseph Speidel and others. Judgment for defendants, and plaintiffs bring error.

*Affirmed.*

Caldwell & Caldwell, for plaintiffs in error.

John J. Coniff and H. M. Russell, for defendants in error.

Poffenbarger, Judge:

The questions to be disposed of in this case grow out of proceedings following the city election, held in the city of Wheeling in January, 1901. The council of said city is composed of two branches, known as the first and second branches, the second branch having twenty-eight members and the first branch fifteen members. The second branch elects its presiding officer who is designated the president of that branch. The first branch is presided over by the mayor. By chapter 52 of the acts of the legislature of 1882 it is made the duty of the council in joint session, and a quorum of each branch being present, at their first meeting after every regular charter election, or as soon thereafter as practicable, in like joint session, to elect three members of the Board of Public Works. Upon the ascertainment of the result of said election it was found that the Second Branch was equally divided. politically, there being fourteen Democrats and fourteen Republicans. The First Branch was composed of six Democrats and nine Republicans which gave the Republicans a majority of three in joint session. Prior to the date fixed for the election of the members of the Board of Public Works, February 26, 1901, one of the Republican members of the Second Branch died and a Democrat was elected as his successor. Three of the other Republican members of the Second Branch declared it to be their intention not to vote for the Republican caucus nominees for the offices to be filled, which made it certain that said nominees could not be elected unless further changes should occur.

The following are some of the rules prescribed by ordinance for the government of the council:

"First. The meetings of the First and Second Branches of the Council shall be held at their respective Council Chambers, on the second and fourth Tuesdays of each and every month;

and also at such times as may be fixed, on special order of adjournment.

59.    A poilce. officer shall be detailed for each Branch of Council, who shall act as sergeant-at-arms at all meetings.

51.    Whenever, at the time appointed for the meeting of either Branch of the Council, there shall be not a quorum present, it shall be lawful for the members of such Branch who may be .in attendance to order the sergeant, or any of his deputies, to arrest the absent members, or any of them, and cause them to appear forthwith at the place of meeting, and there to remain until the meeting adjourn or leave of absence be given.

52.    It shall be lawful for any number of members of either Branch, less than a quorum, who may have assembled at the time appointed for meeting of such Branch, to adjourn to a subsequent time, and cause the sergeant or any deputy to give notice to the absent members of the time to which such adjournment has been made, requiring their attendance at such adjourned meeting, under the penalty of two dollars on each member; and if any such absent member, being so notified, fail to attend such adjourned meeting, he shall forfeit two dollars to the use of the city unless excused for sufficient reason by the Branch of which he is a member.

49.    At all meetings of Council the Branch first wishing to adjourn shall notify the other Branch of its desire to do so, and the presiding officer of the Branch so giving notice shall not take a vote on the question of adjournment until an answer is received from the other Branch.

18.    All questions shall be put in this form: "As many as are of opinion," (as the case may be), "say aye." "Contrary, no !" And in doubtful cases, or where an affirmative vote of two-thirds of the members present is necessary to carry the proposition, the presiding officer may direct or any member may call for a division.

23.    A motion to adjourn shall always be in order, unless the Council is engaged in voting."

An ordinance passed by the council January 12, 1883, and in force, at the time of said election, reads as follows:

"At the first meeting of council after the next regular biennial charter election in said city, or as soon thereafter as practicable, and thereafter at the first meeting of council after the regular biennial charter election, or as soon after such meeting

as practicable, the second branch shall give notice by the proper messenger to the first branch that it is ready to proceed to the election of such officers of the city as are required to be elected by the council. Thereupon the first branch shall proceed in a body to the chamber of the second branch, and they (a quorum of each being present) shall proceed to elect by *viva voce* votes in joint session the proper persons to the offices hereinafter mentioned: One assessor of the city of Wheeling for the north district, one assessor of the city of Wheeling for the south district, collector of the City of Wheeling, clerk of the market, clerk of the Centre market, City sexton, City solicitor, City weigher, Health officer, Keeper of city lockup, Measurer of lumber and wood, Members of the board of public works (three to be elected), Overseer of chain gang, Receiver of the city of Wheeling, Water commissioners (three to be elected), Weighmaster of the city of Wheeling, whose term of office shall continue until his or their successors is or are elected and qualified, unless sooner terminated by resignation or removal from office or other lawful cause."

On the evening of February 26, 1901, fourteen members appeared in the Second Branch, and the president being absent, J. H. Shafer was elected to preside. The roll call showing the absence of a quorum, those present ordered the arrest of the absent members. T. W. Killeen, one of the Democratic members, had failed to qualify in time, and the clerk had omitted his name from the roll as having forfeited his membership. Killeen was then elected by the council as a member from the sixth ward. Under this order Philip Maurer was brought in under arrest and his presence noted, but he refused to answer, claiming he was present by force and against his will. Another roll call showed fifteen members present, and then D. B. Lavey was elected to fill the vacancy occasioned by the death of F. M. Milligan, the deceased Republican member. At this point Mayor Sweeney appeared and questioned the legality of the election of Killeen and Lavey, because the first Branch had not secured a quorum. The sixteen members of the Second Branch thus secured remained in the hall all night and numerous roll calls were had showing the same members present.

At the time of the meeting on said evening, the journal of the First Branch showed that, at the hour of the meeting, there were present six members and the mayor. There being no quorum,

those present requested the city sergeant to arrest and bring in the absentees. The situation remained unchanged in the branch until about 8:30 o'clock the next morning, the six members and mayor remaining there all night awaiting the arrest and bringing in of the absentees.

These absentees had determined, if possible, to prevent the election at that time. For this they had reasons to offer. One was that one of their party was sick and unable to attend the meeting, and another was that two more of them could not be present owing to engagements made long before to attend as performers on a public occasion from which they could obtain no release. The other members desired to postpone the election until all their members could be present. Feeling that it could only be accomplished by absenting themselves, they took that course. The police of the city arrested them during the night, and, in doing so, broke into the rooms in which some of them were.

At 8 o'clock A. M., February 27, 1901, the sergeant appeared in the Second Branch with missing members. R. F. Hill, president of said Branch, took the chair and ordered a call of the roll. The execution of this order showed 25 members present. Upon its completion Robert Hazlett moved an adjournment which was seconded by Mr. Brown. The motion was put by the president and by him declared to have carried. He and the Republican members then started to, or did, leave the chamber, but they were restrained and brought back by the police. There is some controversy as to whether the chairman called for a negative vote on the question, as to whether the president and Republican members actually left the chamber, and as to whether a division was called for, but it is immaterial as to these matters under the principles controlling the case. The other sixteen members, representing the Democratic side, then selected J. H. Shafer again to preside over the meeting and detained Hill and the other Republican members in the room, and thus continued the meeting.

In the meantime, the absent members had been brought into the First Branch by the city sergeant and his deputies, the police force of the city, a roll call was had and the presence of all the members of the First Branch noted. Mr. N. C. Hamilton then moved that the First Branch adjourn, but the mayor refused to put the motion on the ground that the Second Branch had not

been notified of the intention of the First Branch to adjourn, and he sent a messenger to the Second Branch to notify it. Upon the return of the messenger, the motion was renewed and the mayor dclined to entertain it because it was a dilatory motion. From this decision an appeal was taken and sustained by a vote of ten to five. The motion was renewed and a point of order was raised that it was dilatory and the mayor sustained the point of order and again refused to put it. In the petition it is alleged that, after all this, a messenger from the second Branch came in and announced that said Second Branch was ready to go into joint session. Whether this occurred before or after the mayor refused to put the motion to adjourn is in controversy. Upon the announcement of that message the mayor left the chair and went over to the Second Branch, the Democratic members of the First Branch accompanying him voluntarily, and the Republican members under the compulsion of the sergeant and his deputies by order of the mayor. The joint session being thus constituted properly or improperly, according to the respective contentions of the defendants and plaintiffs, the election was held, resulting in the choice of persons other than the Republican caucus nominees, part of those who were there under compulsion refusing to vote. The election resulted in the choice of Joseph Speidel, Charles Menkemeller and Charles W. Kreiter for members of the Board of Public Works.

At a regular meeting of both Branches of the council, held on March 12, 1901, the certificates of the oaths of office, and the joint bond of Speidel, Menkemeller and Kreiter were filed in the Second Branch and approved, and the bond was then sent over to the First Branch, with notice of the action of the Second Branch. Upon receiving said message and bond, the First Branch declined,by resolution, to receive or approve said bond, but the mayor ruled that no action by that body upon the bond was necessary. On the same night the city sergeant, by his deputies, took charge of the office and books of the board of Public Works, under the direction of the alleged new board of Public Works, and stood guard over the same, and prevented the old board and its clerks from exercising further control over them.

On the 22nd day of March, 1901, Henry Schmulbach, Frederick J. Park and Charles M. Frissell, the members of said Board of Public Works, claiming that their successors had not been elected, presented in the circuit court of Ohio County,

their petition for a writ of *mandamus*, alleging the illegality of the election of Speidel, Menkemeller and Kreiter, and praying that an alternative writ of *mandamus* might be awarded, directed to and commanding said Speidel, Menkemeller and Kreiter, and John S. Ritz, city sergeant, to restore and admit petitioners as members of the Board of Public Works and restore to them the possession of their office, books and papers, or show cause why they should not do so, and that, after due and proper proceedings, a peremptory writ of *mandamus* might be issued, compelling them to admit the petitioners to the offices and restore to them the office, books and papers.

There was a demurrer to the petition and a motion to quash the alternative writ, and the circuit court overruled both the demurrer and the motion. Thereupon the defendants filed their return which was held sufficient and then the relators filed a replication, to which the respondents demurred and as to certain portions of the replication the demurrer was sustained and those portions stricken out. To all these rulings of the court exceptions were taken. Evidence was introduced by both parties, and, on the issue, the court found for the defendants, to which finding the relators excepted and moved to set it aside and grant them a new trial but the motion was overruled. The court then dismissed the alternative writ and refused the peremptory writ prayed for in the petition and rendered judgment for the defendants.

The decision of the circuit court on a demurrer to the petition and motion to quash the alternative writ is clearly right, and the reasons assigned therefor in the opinion, filed by his honor Judge Hervey, are not only sufficient but well stated, and the following portions of said opinion are approved and given as sufficient upon the affirmance of that decision by this court:

"That *mandamus* is the proper proceeding by which to try title to office has been long settled in this State. I have not been able to discover in the decided cases any such distinction as that contended for by counsel for defendants, to the effect that the court will not pass upon the title to office in a proceeding by *mandamus* where it is necessary to review the proceedings had by the body making the election.

In the very early case of *Smith* v. *Dyer* (1 Call 562), the District Court, in granting a *mandamus* to restore Dyer to office as clerk of the county board of Pendleton County, necessarily re-

viewed the action of the justices composing the county court. There was no question as to the jurisdiction of the justices— they had the right to elect a clerk; but the court, in reviewing their action, passed upon the regularity of the proceedings taken by them, as well as upon the effect of their action.

In *Dew* v. *Judges*, 3 Hen. & Munf., it was held that *mandamus* is the proper remedy to restore a clerk ousted from his office by the illegal appointment of another. In that case it was contended that the injured party had another remedy; but the court held that, while there might be another tedious method of redress, yet there was no other remedy so well adapted to the nature of the case as *mandamus*.

The rule established by these early cases has always been adhered to in Virginia. In the comparatively recent case of *Lewis* v. *Whittle*, 77 Va. 415, the court, in discussing *mandamus* as the remedy for a wrongful deprivation of office said:

'Wherever there is a right to execute an office, perform a service or exercise a franchise, more especially if it be a matter of public concern, and a person is dispossessed of such right and has no other specific, adequate remedy, then the court ought to assist by *mandamus*, upon reasons of justice, as expressed by the writ, and upon reasons of public policy to preserve the peace, good order and good government. It ought to be used on all occasions when the law has established no specific remedy. Whatever may be the rule elsewhere, it may be safely laid down as the doctrine of this court that *mandamus* is the true remedy for a wrongful deprivation of an office.

This broad and liberal view of the use of the writ has not been followed in many of the states, but the doctrine as settled in Virginia has been adopted in this State, and, as I understand it, is the law by which this Court is to be governed. It has also received the approval of courts in some other states.

As illustrating its application to different cases, see *Collins* v. *Aldrich et al.*, 98 Mass. 557; *Harwood* v. *Marshall*, 9 Md. 84.

While I am not sure that the opinion of the Court in *State* v. *McAllister*, 38 W. Va. 485, can be harmonized with the Virginia decisions, I find nothing in that case which would lead to the conclusion that *mandamus* is not a proper remedy for the case made by the plaintiffs' petition. In *State* v. *McAllister*, the council acted and passed upon the question of the eligibility of the persons elected to council whose right to office was in dispute.

But in this case if the averments of the petition are true, there was no action of council, and the defendants without right thereto usurped the offices they now hold.

It is urged that the defendant, Ritz, should not be made a party to this proceeding, as he makes no claim to the offices in dispute. But the petition shows that the defendants secured possession of the office room, books and papers belonging to the board of public works, and necessary to its administration, by the aid of Ritz as city sergeant, and that by his assistance they have forcibly retained possession of this official property since the time when it was put into their hands.

It thus appears that Ritz is acting with the other defendants in preventing the petitioners from performing the duties of their office. Under these circumstances, Ritz is a proper party defendant, as the writ should go to all persons who wrongfully withhold from the petitioners the office or its property. If the petitioners are entitled to relief the remedy should be complete."

In disposing of the various assignments of error, it is only necessary to inquire whether the joint session of the council was legally convened. If so, the election was valid. But there could be no joint session, and, therefore, no election unless the two branches had been legally convoked. Whether they were must be determined by reference to the powers conferred by law and rules and ordinances adopted by the council, not repugnant to the law.

Section 7 of the acts of the legislature of 1863, amending the charter of the city of Wheeling, provides that: "It shall require the presence of a majority of the whole number of each branch as fixed by law to constitute a quorum for the transaction of business, but a smaller number may adjourn from time to time and compel the attendance of absent members in such way as council may have provided." Under this statutory power, the council provided by ordinance rules 51 and 52, hereinbefore set out *in extenso.* Rule 51 empowers any number of members of either branch, in attendance at the time appointed for the meeting, being fewer in number than that necessary to constitute a quorum, to order the sergeant, or his deputies, to arrest the absent members, or any of them, and cause them to appear forthwith at the place of meeting and remain there until the meeting adjourn or leave of absence be given. Under this rule a minority of each branch met and caused the absent members to be

brought in. The test of the propriety of the action is whether the power thus conferred, by the rule, upon less than a quorum of the members, is in excess of the power conferred by the statute. The rule is, in effect, that any number of members, less than a quorum, may meet at the appointed time and remain in the chamber and cause the others to be brought in. But the legislative act does not say that in terms. It says they may adjourn from time to time and cause the attendance of absent members. But the provision for adjournment from time to time cannot be construed to limit or control the power to compel the attendance of absent members, in respect to the time of such compulsion. Having the power to adjourn and come back and thus keep the meeting alive, they must possess the inferior power of remaining and causing the absent members to come in at the time appointed by law or the city ordinances. In construing this act, the legislative purpose must be kept in view, and that is to prevent the loss or failure of the meeting. This power, vested in less than a majority of the members, must not be given a construction so technical as to impair its efficacy. Moreover, under the general parliamentary law, every legislative assembly, when duly constituted, has the power to compel the attendance of its members. Until so constituted it has no such power for it has no legal existence. Members who are present merely for the purpose of organizing cannot compel the attendance of others, unless authorized by the law to which it is subject. This statute does not say, as does the Constitution of the United States, of the congress, a smaller number than a quorum "may be authorized" to compel attendance, but that they may compel it. Cush. L. Pr. Leg. Assemb. s. 264. The legislature left the mode of compulsion to the council and that body determined that it should be by the arrest and detention of members if necessary to the accomplishment of the purpose. In the determination of this question of authority to compel attendance, it is of no consequence that, in the execution of the order of arrest, the officers entered places, into which they had no right to go, or by means which they could not legally employ. Such irregularities cannot affect the validity of the exercise of the power with which they were clothed, although they may have been such as made the officers liable to an action for damages or a criminal prosecution for trespassing. The action of the circuit court in eliminating, from the replication of the relators, all allegations in respect to

matters of that nature, was clearly right. They may afford grounds of redress to the injured parties in a proper proceeding, and they may have been wholly unnecessary as well as unjustifiable.

Under this power to compel attendance, a quorum was secured in each branch. In the first branch all the members were present and in the second twenty-five of the twenty-nine members were present, and a roll call had been had in each body, showing their presence. This much is uncontroverted. The question then arises as to whether the two branches were still in session when the joint session convened. In other words, had either of them adjourned, so that, although all the members of the first branch went into the second, they did not go as a legally constituted and subsisting body, but only as individuals?

It is not pretended that a majority of the second branch favored an adjournment, at the time the adjournment was attempted, nor that the president of that body could arbitrarily adjourn it, nor that the motion to adjourn was disposed of in the usual orderly way. It is admitted that there was a great deal of confusion at the time, and the evidence is decidedly contradictory as to whether the "noes" were called for by the chair and as to whether any member demanded a division. The court below, having the witnesses present and seeing and hearing them testify, has decided that there was no adjournment, and this finding, on a question of fact, is entitled to great weight in this Court. But there is another insuperable obstacle to the finding that there was a legal adjournment. Rule forty-nine, adopted for the government of both branches, provides that the branch first wishing to adjourn shall notify the other branch of its desire and that the presiding officer of the branch so giving notice shall not take a vote on the question of adjournment until an answer is received from the other branch. The principle of this rule is observed by almost every legislative body in this country, that is composed of two branches, and the example is set by the Congress of the United States. Cush. L. Pr. Leg. Assemb. ss. 504, 506, 513. Its adoption and observance by the council of the city of Wheeling cannot be considered as a mere idle form. Indeed, it is difficult to conceive how two branches of the same body could act concurrently and harmoniously without such a rule. It must, therefore, be held to be binding upon both branches. From this it results that no adjournment could have taken place,

for the president could not legally put the motion, as it is not claimed that such notice was given and answer received.

The matters set up in the replication to the return, concerning the election of Shafer to preside after Hill declined and the legality of the election of Killeen and Lavey are foreign to the question and the court properly struck them out. After the absentees were brought in, there was a quorum in the second branch without those two members. Mr. Hill's refusal to serve further as president could not prevent the further transaction of business.

As to the adjournment of the first branch, unless it can be said that, because of the desire of a majority of its members to adjourn, evidenced by conduct alone, which was frustrated by the presiding officer, it must be deemed and held that there was an adjournment, the finding of the court below on that question was clearly right. It cannot be said, in fact, there was an adjournment of that body, however arbitrary and wrong the conduct of its presiding officer may have been. Courts of equity sometimes treat that which ought to have been as having been done. But this is not a suit in equity. As is well said by Judge Hervey in his opinion, the averments of the alternative writ do not show an adjournment of the first branch. If they did they would fail for want of proof.

The convocation of the joint session is the next subject for consideration. In this connection it is claimed that, even if the first branch was in session, those who were opposed to the holding of a joint session at that time could not be legally compelled by the sergeant, under the direction of the presiding officer, to go into the second branch. If the legality of the joint session depended alone upon this question, it could not stand for a moment. The police force of the city belongs to its executive department and cannot be suffered to control, merely as executive officers, the deliberations or conduct of the council, in any way or to any extent. It must be remembered that the rule adopted for compelling attendance, provides for detention of the members until adjournment or until leave of absence be given. No adjournment had taken place, nor had any leave of absence been given. Those who had been brought in as absentees were still subject to and under the power which had brought them in. The police officers were mere instrumentalities or agents in the hands of those who were authorized by the law to compel the

holding of a session of the first branch. ⋅ Who should execute the
order of arrest, made by those who appear at the time appointed
for a meeting? The persons designated for the purpose in the
ordinance of course. Who were the persons so designated? The
police officers. Rule fifty-nine also makes police officers ser-
geants-at-arms of both branches. It would be absurd to say the
chief of police can detail one of his force to do what he himself
cannot do, and also to say that the sergeant-at-arms cannot
summon to his assistance sufficient force to execute the power
vested in him. Nor is it material that the persons summoned
by him are members of the police force. Their acts under him,
armed with the order of arrest and detention lawfully issued by
those empowered to compel the holding of the meeting are the
acts of the sergeant-at-arms and not the acts of the police force
merely, although they are policemen.

Presumably the minority, in ordering the sergeant-at-arms to
compel the majority to go with them into the second branch,
acted upon the belief that the authority, under the rule, to detain
the unwilling members until adjournment or leave of absence
given, extended to the enforcement of their attendance upon the
body when it became its duty to repair to the second branch.
That contention is not without reason. They did not go merely
as individual members of the council, but as the first branch, an
integral part of the council, although, when in the second
branch, the two branches became merged into one larger body
with a common presiding officer. When they came out of the
joint session they came as the first branch. It cannot be other-
wise, for the first branch had met and had not adjourned. It is,
therefore, perfectly logical to say the power of detention, vested
by law, was undivested and operative during all those proceed-
ings, and as effectual to detain while the body was in transit
from one room to the other, as when the first branch was in its
own chamber.

But it may be said, how could the minority of that body con-
trol its majority? How could the body itself be taken by the
sergeant-at-arms from its own chamber into the chamber of the
second branch against the will of the majority? Has not that
body the power to control itself by its majority? Can its mere
creature, the sergeant-at-arms, take it where he will by force?
By no means. If the branch had had the power to determine, by
motion or resolution, whether it would go into joint session and

the majority had voted not to go into joint session, its compulsory attendance could not be countenanced in any court. But a vote on the question was neither necessary nor permissible. By the ordinance adopted January 12, 1883, it was provided that upon the mere announcement by messenger of the readiness of the the second branch to go into joint session, the first branch should proceed in a body to the chamber of the second branch and proceed to elect officers. Its duty to go into joint session without an affirmative, or any vote on the question was a matter of antecedent agreement and consent expressed by an ordinance that is legal and binding until repealed. Its duty to go into joint session for the election of officers is imposed by law, but the law does not fix the exact time of holding such session. Acts 1882, chapter 52, section 1. The ordinance passed in pursuance of the statute left the fixing of the day and hour of holding it in the hands of the second branch, the only restriction being that that body should give the notice and thus convene the joint session at the first meeting of council after the regular biennial charter election, or as soon thereafter as practicable. The first branch thereby surrendered its control over the matter of fixing the day and hour of holding the joint session, and, in going into it upon notice from the second branch, it acted, not upon its volition, but in pursuance of its former agreement, a binding law, passed for the government of the council.

If it be regarded as nothing more than an agreement between the two bodies it was binding, according to the weight of American authority. One of the leading cases on the subject is *Beck* v. *Hanscom*, 9 Foster (N. H.) 213, in which the following was held:

"The charter of Portsmouth provided that the board of aldermen and the common council, in their joint capacity, should be denominated the city council, and that a majority of each board including the city council should constitute a quorum for the transaction of business. The board of aldermen and the common council separately voted to meet in convention on the 12th of June, for the choice of city officers, including the city marshall, but when the time arrived, only a minority of the board of aldermen appeared. The common council and these aldermen, twenty-three persons being present, and constituting a majority of both boards, in their capacity as the city council, proceeded to elect officers, and made choice of the respondent as city mar-

shal, by a majority of the votes present. Upon the petition for a *mandamus,* it was *held,* that after the board of aldermen had agreed upon a day for meeting in convention, it was not necessary that a majority of them should be present, in order to make the elections by the city council legal, and the petition was dismissed."

In the opinion the court said: "To hold that in the circumstances of this case, the omission of the aldermen to go into convention could put a stop to the legislative action of the city council, would be, we think, to offer a premium for a neglect of duty. * * * * We can imagine no case where, after every preliminary step has been taken, the mere neglect of one of the constituent bodies to carry its previous vote into effect, ought to have the power of hindering the other bodies from preforming the duties required by the charter." *Kimball* v. *Marshall,* 44 N. H. 465, goes further and holds that where the mayor, aldermen and city council are required by law to meet on a certain day to elect a city clerk, one-half of the aldermen cannot defeat a legal election by absenting themselves for the purpose of leaving the board without a quorum. In *Whiteside* v. *People,* 26 Wend. (N. Y.) 634; it was held that where two distinct bodies meet by agreement to remove an officer and elect his successor and one body has made a nomination and the other has not, and all the members of one of the bodies refuse to act and leave the joint meeting, and those remaining, being a majority of the whole number of both bodies, go on and remove the officer and elect his successor, the removal and election are legal. In *Launtz* v. *People ex rel Sullivan,* 113 Ill. 137, it was held that a majority of the council could not defeat an election by refusing to vote or protesting against the election. *First Parish* v. *Stearns,* 21 Pick. (Mass.) 148, asserts the same principle in different form, and under different circumstances. In *People* v. *Batchelor,* 22 N. Y. 128, it is held that all the members of a corporate body are presumed to have notice of the time of holding its stated meetings and are bound thereby. Judge Dillon, a most eminent authority, says in his work on Mun. Cor. at s. 284: "The doctrine of the English courts is, that *all of the integral parts* of a corporation necessary to do an act must not only meet, but *remain present till the act is completed;* and therefore if one of such parts deserts or withdraws, though wrongfully and to defeat any action, before the act is consummated, the act is not

valid. The liability of this rule to abuse, since it enables one of the parts of a joint meeting or assembly to defeat any action whatever, has led the courts in this country to deny its applicability here, or to apply it with caution."

This principle and the decisions referred to go much farther than it is necessary to go to uphold the legality of the election in this case and it is not the intention here to approve the principles announced in all these cases, but only to direct attention to the tendency of American decisions on the subject. Without taking the advanced ground laid down there, it might be well said here, as in the court below, that as it was the legal duty of the members arrested and brought in, to be in their respective branches and to go into joint session, their mere presence there when the election took place, without regard to the means by which their presence was secured, makes the election legal. When the election complained of and undergoing this investigation took place, there was a quorum in each branch. There was a quorum of each branch in the joint session. The members were where it was their legal duty to be at the time and the election then and there held was required by law to be held at that time, if practicable. Many of the members were there, according to this theory, under duress and coercion, but that coercion only resulted, for the purposes of this case, in the performance of what these members were legally bound to do. No case is recalled in which it has been held that duress of imprisonment will invalidate an act which the party seeking to avoid it on that ground was bound to do. Where a person guilty of crime is kidnapped in another state and forcibly brought back for trial he cannot claim to be returned to such other state to be extradited. The court has jurisdiction to go on and try him without regard to the means by which he was brought into its jurisdiction. *Mahon* v. *Justice,* 127 U. S. 700; *Cook* v. *Hart,* 146 U. S. 183.

It is not material, if true, that the Democratic members so maneuvered as to prevent an election before the political complexion so changed as to give them control of the situation. If their conduct was unfair, deceitful and unconscionable as between man and man, it can in no way affect the validity of this election. These acts were not parts of the election itself. Acts of fraud or unfairness which in no sense actually entered into the election, but were remote as well as prior, cannot be held to

invalidate it.  It is certain that the election made on the morning of February 27, 1901, is the only election of members of the board of public works made by the present council.  It cannot be said that because the Republican members would have elected other persons, had the joint session occurred earlier, they must be deemed to have been elected.  Nor can the fact that part of the Republican members deserted their fellows be given any weight in deciding this case.  That betrayal may have been one manifesting the basest of ingratitude and the most open and unjustifiable breach of agreement or understanding, but it was a wrong for which no provision of law gives a remedy, nor any court redress.  It was merely a breach of political or social duty of which the law takes no cognizance, and its serious consequences to those who reposed confidence in their unfaithful associates, can only be counted among the painful disappointments and vicissitudes, incident to political life.  The court below properly dismissed these matters as foreign to the matter before it for adjudication and its action in so doing is affirmed.

Two matters of contention remain to be disposed of.  One is the fact that the first branch has not approved the bond of the newly elected members of the Board of Public Works.  There is a difference of opinion between the opposing counsel as to whether it is necessary that such bond be approved by the first branch, but whether it be or not is wholly immaterial.  The failure is due to no fault on the part of the new members.  They have tendered a bond, the sufficiency of which is not questioned.  It is contended only by the first branch that the persons offering the bond have never been elected and have no right to execute and have such bond approved.  The first branch, under a misapprehension as to their right to permit the giving of the bond, has prevented the qualification of the officers in that particular.  This cannot prejudice their right, and it has been so decided in *Culver* v. *Armstrong,* 77 Mich. 194.  The first branch placed its refusal to accept and approve the bond upon ground wholly untenable.  A person or municipal board whose duty it is to approve an official bond has no right to refuse its approval on the ground that the person offering to qualify has no title to the office.  Throop on Pub. Offices, ss. 170, 172.  Besides this there are cases holding that when an officer has received no notice of his election or appointment until after the expiration of the prescribed time within which he should have qualified,

his failure to qualify within that time does not affect his right to the office. So the failure in this instance, even if entitled to the weight plaintiffs in error claim for it, had it been due to the fault of the officers, cannot affect the title to the offices because it resulted from a cause over which they had no control.

It remains now only to consider the taking possession of the room, furniture, books and papers. That was a flagrant wrong. The courts were open to the new officers and their process at their command to compel the delivery to them of the property so violently taken, and their conduct in that respect cannot be excused by the exigencies of the occasion or situation nor by the obstructive conduct of those who opposed their election and denied their right to the offices. But it was a wrong for which the law gives redress, it was a trespass, giving a right to damages. It cannot affect the right of the defendants to the offices. That right depends upon the election. The forcible taking of the property was subsequent to the election which vested the right of office, and was in no sense connected with the election. The only question that can be determined here is whether the respondents are legally elected officers. A wrongful act done by them after election cannot be held to relate back so as to invalidate the election. Malfeasance in office is cause for removal, but that is a matter very different from a proceeding to test the original title to the office. Every wrong done by an officer does not amount to cause for removal and, if this did, it could not be inquired into in this proceeding.

The conclusion, therefore, is that the respondents were legally elected and legally hold their offices, and that the judgment of the circuit court is right in all respects and should be affirmed.

*Affirmed.*