# CHARLESTON.

BOOTEN v. PINSON,
DUDGEON v. HALL,
NUNEMAKER *et al.* v. BOOTEN *et al.*,
HALL v. BOOTEN *et al.*,
and
PINSON v. BOOTEN *et al.*

Submitted December 14, 1915.    Decided December 17, 1915.

1. MANDAMUS—*Right to Remedy—Exclusion from Office—Evidence.*
    Mandamus is a proper remedy to admit a person to office from which he is wrongfully excluded, provided he is shown to have a clear, *prima facie* legal right thereto.  (p. 415).

2. CONSTITUTIONAL LAW—*Municipal Corporations—Officers—Right to Abolish—Vested Rights.*
    A vested right to a municipal office does not exist, and the legislature may, by altering the charter of a city, abolish an office, although the term for which the claimant thereto was elected has not expired.  (p. 416).

3. EVIDENCE—*Officers—Qualifications of Appointee—Presumption.*
    When the governor has appointed certain persons to offices, pursuant to legislative act, creating the offices and authorizing him to appoint persons to fill the same, having certain defined qualifications, it will be presumed, in the absence of a showing to the contrary, that the persons so appointed are legally qualified.  (p. 417).

4. MUNICIPAL CORPORATIONS—*Commission Government—Amendment of Charter—Constitutionality—Taxation.*
    Chapter 14, Acts 1915, amending the charter of the city of

Williamson, a city of more than two thousand inhabitants, changing the plan of its government from the ordinary form administered by a mayor and councilmen, to a government by five commissioners, and authorizing the governor to appoint the first commissioners, to hold office for a period of two years, beginning July 1, 1915, and ending June 30, 1917, and providing for the election of their successors by the voters of said city, at the first election provided for in the act, to be held on the first Thursday in June, 1917, does not contravene Sec. 9, Art. X, or any other written provision, or violate the spirit of the Constitution.   (p. 417).

5.  SAME—*Officers—Appointment by Governor—Validity of Statute.*
    The legislature is not prohibited by the Constitution from establishing municipalities and providing for their government by officers to be appointed by the governor; such acts are within its lawful power.   (p. 423).

6.  CONSTITUTIONAL LAW—*Statutes—Construction—Province of Courts.*
    Unless the question is free from doubt, it is the duty of courts to uphold legislative acts as constitutional.   (p. 428).

(POFFENBARGER, PRESIDENT, dissenting.)

Error to Circuit Court, Mingo County.

Proceedings by Orland H. Booten against A. C. Pinson, by Gail T. Dudgeon against John S. Hall, and by A. C. Pinson, by John S. Hall, and by Tunia Nunemaker and others against O. H. Booten and others.   Decisions for plaintiffs in the two cases first mentioned, and defendants bring error; and decisions for defendants in the three cases last mentioned, and plaintiffs bring error.

*Affirmed.*

*Vinson & Thompson, John A. Sheppard, Wiles & Bias* and *Campbell, Brown & Davis,* for plaintiffs in error.

*Wells Goodykoontz* and *John H. Holt,* for defendants in error.

WILLIAMS, JUDGE:

Two of these proceedings are in mandamus, one of which has for its object the admission of Orland H. Booten to the office of mayor of the city of Williamson and incidental ouster of A. C. Pinson who now occupies it, on the ground of title thereto in Booten and lack of such title in Pinson; and the other, the admission of Gail T. Dudgeon to the office of clerk

of said city and ouster of John S. Hall who holds the same office under the name of recorder. The other three proceedings are in equity, one by Pinson to enjoin the defendants from interference with his office, until the question of title can be settled, another by Nunemaker and five others, councilmen of the city, to restrain Booten and others, commissioners appointed under an act of the legislature to take over the management of the city, from interfering with them until the validity of the act can be determined, and the third by Hall to enjoin Booten and others, commissioners, from interfering with his office of recorder, pending the litigation in the mandamus cases.

Prior to the 1st day of July, 1915, the city of Williamson was governed by a council consisting of six members, a mayor and a recorder. By an act of the legislature, passed at the regular session thereof in 1915, the charter under which the city was so organized and governed was amended and re-enacted so as to provide for government thereof, on and after the 1st day of July, 1915, by five commissioners. The new scheme of government is bi-partisan in character. The terms of the office of the commissioners are two years. Not more than three of them can be members of the same political party; and the governor was authorized to appoint them, for the first term of two years, beginning on the 1st day of July, 1915, and ending on the 30th day of June, 1917. Thereafter the commissioners are to be elected every two years. Respondents in the mandamus proceedings had been elected under the old charter for terms of two years, beginning on the 1st day of May, 1915, and ending on the 30th day of April, 1917; and the new charter provided that those in office at the time of its passage (which was held, in *State ex rel.* v. *Pinson, Mayor et al.*, 76 W. Va. 572, to mean the time the act took effect) should hold until the 1st day of July, 1915. Under the new act, the governor appointed Booten, Dudgeon, Studebaker, Green and Cooper commissioners and, agreeably to a provision of the act, they elected Booten mayor and Dudgeon city clerk. Pinson, mayor, and Hall, recorder, denying the constitutionality of the act, legislating them out of office, and under which the governor had made his appointments, refused, after the 30th day of June, 1915, to vacate the offices

held by them and to permit Booten and Dudgeon to take them. Thereupon Booten and Dudgeon instituted their respective proceedings in mandamus for their admission into these two offices, and Pinson brought his suit in equity against Booten and the commissioners to restrain them from interfering with his possession, pending the proceedings in mandamus. Hall took like action against interference with his possession and Nunemaker and his associate councilmen took the same method for maintaining their positions. The circuit court heard all of the proceedings at one time and, being of the opinion that the act under which the commissioners were appointed was valid, awarded the writs of mandamus and dissolved the injunctions, in so far as they related to or affected Booten and Dudgeon, but left them in force as to Studebaker, Green and Cooper, the three commissioners who had taken no steps to obtain possession of the offices to which they had been appointed. Writs of error in the law proceedings and appeals in the chancery causes have brought the judgments and decrees here for reversal.

All of the defenses in the mandamus proceedings, inappropriateness of the remedy, lack of an averment of eligibility of the plaintiffs and invalidity of the act under which they were appointed, were interposed by motions to quash the writs.

It is admitted that, if respondents are in possession of the offices without any color or right, mandamus is the proper remedy to admit thereto the rightful claimants, under the authority of *Bridges* v. *Shallcross,* 6 W. Va. 562, *Kline* v. *McKelvey,* 57 W. Va. 30, and *Schmulbach* v. *Speidel,* 50 W. Va. 553. Whatever may be the remedy in other states, the cases above cited settle the rule in this state that, mandamus lies to admit to office the rightful claimant thereof, the only condition being that relator must show a "clear, prima facie right thereto shown by a commission, certificate or other legal evidence thereof." *Kline* v. *McKelvey, supra.* Counsel seek to distinguish the case at bar from those cited, on the ground that relators have not shown such clear, prima facie right as is required. Whether they have or not, depends upon whether the act amending the charter of Williamson is constitutional. If it is, then the governor's commissions prove relators' rights

to the offices and likewise show that respondents are holding without color of right. The question is one of law and not of fact; and it can not be said, because the legal question is a difficult one, the prima facie right does not appear. The court must determine whether or not the act is valid in order to determine whether respondents have such title as will justify the issuance of the writ; and a decision of that question of law determines at once the rights of both sets of claimants.

Complaint is made that the act robs respondents of the greater portions of the terms of office for which they were lawfully elected. The law recognizes no such thing as a vested right in a political office, created by the legislature; hence, the cutting short of their terms violates no personal rights. If respondents have any rights they are political, not personal, and are subject to the legislative will. True respondents were elected for terms which were to expire April 30, 1917, but their election was had under the old charter which is abrogated by the new one, if it is constitutional, providing for a new form of city government by a different class of municipal officers.

It is further urged that the motion to quash the alternative writ should have been sustained on the ground that eligibility of relators is not averred. Secs. 6 and 10 of the act are as follows:

(6) "No person shall be eligible to the office of commissioner unless at the time of his election he is legally entitled to vote in the city election for member of the commission, and was for the preceding year assessed with taxes upon real or personal property within the said city of the assessed value of two hundred dollars, and shall actually have paid the taxes so assessed."

(10) "It shall be the duty of the governor, on or before the first Thursday in June, one thousand nine hundred and fifteen, to appoint for said city five commissioners, not more than three of whom to be selected from the same political party and having the qualifications herein prescribed, whose term of office shall begin on the first day of July, one thousand nine hundred and fifteen, and continue until June thirty, one

thousand nine hundred and seventeen and until their suc-
cessors are elected and qualified as prescribed by law.''

The alternative writ does not expressly allege that relators
possessed the required qualifications. It does allege, how-
ever, that the governor "did on the 2nd day of June, 1915,
pursuant to said Act, appoint the five following commissioners
for the City of Williamson," naming relators. Their eligibil-
ity may properly be inferred from the governor's appoint-
ment. It will be presumed that official action has been prop-
erly performed; and, eligibility being a question to be
determined by the governor before exercising the power of
appointment, it will be presumed that he appointed eligible
persons. 16 Cyc. 1077; 9 Enc. of Evi., 944; Lawson on Pre-
sumptive Evidence, 67; Throop on Public Officers, Sec. 19;
*Robinett* v. *Preston's Heirs*, 4 Grat. 141. "A public officer
is presumed to have done his duty until the contrary is
shown." *Winslow* v. *Beal et al.*, 6 Call 45. In view of this
legal presumption, the question of eligibility can not be raised
by motion to quash or demurrer. The two cases from
Kentucky, cited by counsel, although more nearly in point
than any others to which our attention has been called, do not
support their contention. They are. *Justices of Jefferson Co.*
v. *Clark,* 1 T. B. Mon 82, and *Justices of Spencer Co.* v. *Har-
court,* 4 B. Mon. 499. In the former case Clark's eligibility
was raised by the return to the alternative writ of mandamus,
and in the latter case the rule issued against Harcourt to
appear and show cause why his seat should not be declared
vacant, called his attention to the fact that made him in-
eligible, and, in his answer to the rule, he admitted it. In
neither of those cases was the question of eligibility raised by
demurrer or motion to quash.

It is strenuously urged by the learned counsel for plain-
tiffs in error that the act is in contravention of both the letter
and the spirit of our Constitution and is, therefore, void; and
many of the provisions of the Constitution are cited, and Sec.
9, Art. X, is particularly relied on, as imposing restrictions
upon the legislature respecting its control over municipalities.
It is claimed that the legislature exceeded its constitutional
powers when it undertook to provide for the appointment of
the municipal officers of the city of Williamson, without the

consent of its citizens. First, let us inquire if the Constitution does actually contain any express limitations in that respect. Sec. 9, Art. X, the provision on which the greatest reliance is placed, is as follows: "The Legislature may, by law, authorize the corporate authorities of cities, towns and villages, for corporate purposes, to assess and collect taxes; but such taxes shall be uniform, with respect to persons and property within the jurisdiction of the authority imposing the same."

We observe that this section does not provide who shall constitute the corporate authorities, nor how they shall be brought into being, whether by appointment or by election. It was intended to confine the right of taxation to the corporate authorities, and to limit their power to levy taxes for corporate purposes only. It is not a limitation upon the power of the legislature to prescribe the number and official character of the municipal authorities, and the manner in which they shall be chosen.

It is claimed that Sec. 9, Art. X, of our Constitution is modeled after a similar clause in the constitution of Illinois, and that, under the authority of *Winans* v. *Winans,* 22 W. Va. 678, and *Brannon* v. *County Court,* 33 W. Va. 789, we also adopted the construction previously placed on it by the supreme court of Illinois; and numerous decisions are cited from that state in support of the proposition that, by the phrase "corporate authorities", is meant officers who are either directly elected by the people, or appointed by some mode to which they have given their assent. From a careful examination of the cases cited, it will be seen that the courts' decisions did not rest upon a construction of that particular provision standing alone, but was derived from a consideration of the spirit of the entire instrument as indicated by other provisions read in connection with the one from which our Sec. 9, Art. X, is taken. One of the earliest cases to which we are cited is *People ex rel.* v. *Mayor, etc., City of Chicago,* 51 Ill. 17, decided in 1869. By an act approved February 18, 1869, the legislature designated certain lands in North Chicago and Lake View to be acquired and used for a public park, to be known as Lincoln Park. The park was placed under the exclusive control and management of a board

of commissioners, who were authorized to purchase the lands within the boundaries prescribed by the act, and have the title thereto conveyed to the city. The lands were to be paid for with funds to be derived from bonds of the city of Chicago, which act required the mayor, comptroller and clerk of said city to issue and deliver to the park commissioners from time to time, as they should demand. The mayor, comptroller and clerk refused to issue the bonds, and the commissioners sought to compel them to do so by mandamus. The case was decided upon a demurrer to the alternative writ raising the constitutionality of the act. The court held the park commissioners were not the corporate authorities within the meaning of section 5, article 9, of the Illinois constitution, that while the act did not expressly confer upon the commissioners the power to levy and collect taxes, it did so indirectly, by authorizing them to create a debt for which the city was made liable and compelled to pay. The court, in its opinion, considered other provisions of the constitution, particularly section 37, article 3, prohibiting the state from creating a debt exceeding $50,000.00, without the consent of the people, to be manifested by a vote at a general election. The act authorized the creation of a debt on the city of Chicago, more than ten times the amount the legislature could place upon the people of the state, without their assent expressed by a vote. Breece, C. J., in the opinion, page 34, referring to the section last cited, says it ought to "settle the question beyond all controversy." He further says, page 36: "The legislature in imposing this burden upon the city of Chicago, assumed a power which the constitution of the State, in its spirit and true meaning, inhibited them from exercising." We do not see how the case could have been otherwise properly decided. Everyone must admit that the park commissioners were not the "corporate authorities" of Chicago, within the meaning of section 5, article 9, of the Illinois constitution, and that the effect of the act was to violate that provision. That case has been followed in numerous other decisions in that state. In *Lovington* v. *Wider*, 53 Ill. 302, it appears that the legislature, in 1867, passed an act establishing a police for the city of East St. Louis, providing for the appointment, by the governor, of three police commissioners who were to control the

police department of the city. They were authorized to make annual estimates to the city council, of the money necessary for the maintenance of their department, and, in case the council failed to appropriate the money according to their estimates, they were authorized to issue certificates of indebtedness in the name of the city, which were receivable in payment of city taxes; and, by an amendatory act, these certificates were convertible into city bonds, on the demand of the holder. The court held this act to be in violation of section 5, article 9, of the constitution of 1848, a similar provision to Sec. 9, Art. X, of our Constitution. The city of East St. Louis being already supplied with a mayor and common council, the similarity between the two cases is easily discernible. But the court there laid down the following proposition, viz.: "By corporate authorities, as used in this clause of the constitution, must be understood those municipal officers who are either directly elected by the people of the municipality, or appointed in some mode to which they have given their assent," citing *People ex rel. McCagg* v. *Mayor of Chicago,* 51 Ill. 17, and other cases. It thus appears that the court's definition of "corporate authorities" and of how they shall be brought into being, is not derived from a construction of the single provision in the Illinois constitution from which Sec. 9, Art. X, of our Constitution is taken, but is derived from the spirit and tenor of their constitution, construed in its entirety. Hence, it can not be said that, because we adopted Sec. 9, Art. X, from the constitution of Illinois, we thereby adopted the construction which the courts of that state placed on it. Standing alone and unaided by other provisions indicating a purpose to place restraints upon the legislature respecting its power over municipalities, Sec. 9, Art. X, could not properly be given the construction contended for without resorting to unwarranted implications. Restraints upon legislative powers are not to be lightly inferred.

Municipalities derive all their power as well as their existence from the legislature, and, in the absence of any express constitutional reservations in their favor or express limitations upon the legislative control over them, they can exercise only such powers as are directly conferred by their charters.

One of the most essential powers of government is the right to raise revenue; no government could maintain itself without such power. Yet it must be admitted that municipalities have no right to levy taxes, unless the authority to do so is expressly conferred by the legislature, or is necessarily implied from some other power expressly given, which can not be exercised without the right to levy a tax. As, for instance, the power to issue bonds with no express provision as to how they shall be paid. 5 McQuillin, Sec. 2363; 4 Dillon, (5th ed.), Secs. 1377 to 1380. The taxing power belongs alone to sovereignty. No such power inheres in municipal corporations. It is needless to cite authorities to support a principle so universally recognized as this. But, for a fuller discussion of it, see *Passenger Ry. Co.* v. *Pittsburg,* 226 Pa. 419, and *City of Richmond* v. *Daniel,* 14 Grat. 385.

Municipalities are but political subdivisions of the state, created by the legislature for purposes of governmental convenience, deriving not only some, but all of their powers from the legislature. They are mere creatures of the legislature, exercising certain delegated governmental functions which the legislature may revoke at will. In fact, public policy forbids the irrevocable dedication of governmental powers. The power to create implies the power to destroy. Furthermore, the legislature may incorporate a city of more than two thousand inhabitants even against the will of the inhabitants. Consent or acceptance is not required as formerly, when charters were granted by the crown. It may also, without the consent of a city, change its form of government, determine the number and character of its officers, and define their powers and duties. It may even prescribe the mode of procedure to be observed in passing its ordinances. *City of Moundsville* v. *Yost,* 75 W. Va. 224, 83 S. E. 910. It may prescribe a different qualification for municipal officers than is required of state officers. *State* v. *McAllister,* 38 W. Va. 485; *Kahle* v. *Peters,* 64 W. Va. 400; and *McMillin* v. *Neely,* 66 W. Va. 496. In the absence of any express constitutional restriction, it may also prescribe the qualification of municipal electors. 2 McQuillin, Sec. 413; 1 Dillon, Secs. 59 and 371; 15 Cyc. 296; *State ex rel.* v. *Dillon,* 32 Fla. 545; *Wheeler* v. *Brady,* 15 Kan, 26; *State* v. *Peacock,* 15 Neb. 442; *Belles* v.

*Burr*, 76 Mich. 1; *Mayor, etc.* v. *Shattuck*, 19 Col. 104; and *Plummer* v. *Yost*, 144 Ill. 68. "The right to vote is not an inherent or absolute right generally reserved in bills of rights, but its possession is dependent upon constitutional or statutory grant. Subject to the limitations contained in the Federal Constitution such right is under the control of the sovereign power of the State, and where the Constitution has conferred the right and prescribed the qualifications of electors, the Legislature can not change or add to them in any way; but where the Constitution does not confer the right to vote or prescribe the qualifications of voters, it is competent for the Legislature, as the representative of the law-making power of the State, to do so." *State ex rel. Dillon, supra.*

In his opinion, in *Burch* v. *Hardwicke*, 30 Grat. 24, Judge Staples says: "They (municipalities) are instrumentalities of the government acting under delegated powers, subject to the control of the legislature, except so far as may be otherwise expressly provided by the constitution." Note the word "expressly".

In *Hornbrook* v. *Town of Elm Grove*, 40 W. Va., at page 549, Judge BRANNON, in the opinion, quotes with approval from the opinion of Justice Field in *Meriwether* v. *Garrett*, 102 U. S. 511, the following: "Municipal corporations are mere instrumentalities of the state for the more convenient administration of local government. Their powers are such as the legislature may confer, and these may be enlarged, abridged or entirely withdrawn at its pleasure. This is common learning, found in all adjudications on the subject of municipal bodies, and repeated by text writers. There is no contract between the state and the public that the charter of a city shall not be at all times subject to legislative control."

In view of these vast powers which, it must be admitted, the legislature may exercise in the control over municipalities, unless expressly restrained by the Constitution, how can it be logicaly said that municipalities have inherent rights? Can it be possible for inherent rights to exist, which may not be enjoyed except at the will of some authority other than those who claim the rights? The rights contended for can not be enjoyed in any manner without the legislative will. To say that municipalities have inherent political rights, and at the

same time admit that all their powers are delegated by the legislature, is a contradiction in terms. The principle contended for seems to be both illogical and paradoxical.

We look to the Constitution to ascertain what restraints, if any, the people have placed upon the legislature, not to determine what powers they have conferred, for, under our republican form of government, the legislature possesses the sole power to make laws, and it is, necessarily, invested with all the sovereign power of the people, within its sphere. Nothing that is a proper subject of legislation is withheld by implication.

Counsel cite Sec. 4, Art. IV; Sec. 39, Art. VI; and Secs. 6, 7, 8 and 9, Art. X, of the Constitution, as recognizing the right of local self-government. We have already considered Sec. 9, Art. X, which we think is the only one among those cited that can have any possible bearing on the question. A mere perusal of the others will show they are not in point. We find in the Constitution no express provision restricting the legislative power to regulate and control municipal governments in cities containing a population of more than two thousand, and the only manner in which its power over smaller towns is qualified is, that it can not incorporate such towns or amend their charters, except by general laws. But it is insisted that, even though the Constitution contains no express inhibition upon the legislative power over municipalities, the right of local self-government must be inferred; that such right is inherent in the people of every community; that when our forefathers came to this country they brought this principle with them; that forms of local self-government existed before written constitutions; and that, in the adoption of state constitutions, it was never intended by the people that they were surrendering to the legislature the right of local self-government. A few of the states have held such principle to exist, notably Michigan, Indiana and Kentucky. One of the leading cases, so holding, is *People* v. *Hurlbut*, 24 Mich. 44, decided in 1871. In that case all of the judges filed opinions. It was a *quo warranto* proceeding to test the right of certain persons to hold office as water and sewer commissioners for the city of Detroit, which they were holding by virtue of an act of the legislature, passed in 1871, creating said board

77 W. Va.

of commissioners, and appointing the members thereof to
office, to hold for terms of two, four, six and eight years,
respectively. The constitutionality of the act was assailed on
two grounds, (1) that by the constitution of the state the
right of appointment to local office was given to the executive
department, and not to the legislature, and (2) that the ap-
pointment contravened the right of local self-government.
The extreme views there expressed by Judge Cooley, respect-
ing the socalled right of local self-government, were not
necessary to a decision of the case, and are clearly against
the great weight of American authorities. To what extent
that distinguished jurist may have been influenced by the
express provisions of his own state constitution, it is hard
to determine from reading his opinion; but that he was in fact
influenced to some extent thereby, is shown by the following
quotation from page 109 of the report. He says: "But I
think that, so far as is important to a decision of the case
before us, there is an express recognition of the right of local
authority by the constitution. That instrument provides
(Art. XV, Sec. 14) that 'judicial officers of cities and villages
shall be elected; and all other officers shall be elected or ap-
pointed, at such time and in such manner as the legislature
may direct.' It is conceded that all elections must, under this
section, be by the electors of the municipality. But it is to be
observed that there is no express declaration to that effect to be
found in the constitution; and it may well be asked what
there is to localize the elections any more than the appoint-
ments. The answer must be, that in examining the whole
instrument a general intent is found pervading it, which
clearly indicates that these elections are to be by the local
voters, and not by the legislature, or by the people of a larger
territory than that immediately concerned. I think also that
when the constitution is examined in the light of previous and
contemporaneous history, the like general intent requires, in
language equally clear and imperative, that the choice of the
other corporate officers, shall be made in some form, either
directly or indirectly, by the corporators themselves."

The supreme court of Indiana, in *State ex rel. Jameson* v.
*Denny, mayor,* 118 Ind. 382, asserted the same doctrine, and
quoted with approval from the opinion of Judge Cooley. But

the dissenting opinion, filed in that case by Justice Mitchell, we think, expresses the correct principle. At page 411, he says: "The Constitution has erected no standard by which to determine what constitutes local self-government, or what are natural and inherent rights, as those terms relate to municipal government. These are questions of political, and, therefore, of exclusively legislative concern, with which other departments can not interfere without invading the legislative domain."

As likewise sustaining the doctrine of local self-government, see *City of Lexington* v. *Thompson*, 113 Ky. 540. But these cases, as well as a few others that may be found, are unquestionably against the great weight of judicial decision in this country, and are unsound in principle. Judge Dillon, a distinguished judge, as well as teacher and writer of law, and of whose great work on municipal corporations it was said by the American Bar Association, in a resolution, passed at its annual meeting in 1909, accepting the author's dedication of his fifth edition, "His great work on municipal corporations will live after many of the municipal corporations themselves shall have perished," says, Vol. 1, Sec. 98: "It must now be conceded that the great weight of authority denies *in toto* the existence, in the absence of special constitutional provisions, of any inherent right of local self-government which is beyond legislative control."

In discussing the powers of the legislature, in that most excellent work of his, Constitutional Limitations, page 126, (6th ed.) Judge Cooley himself declares the true principle. He there lays down the following, as one of the fundamental rules by which to measure the extent of legislative authority in the state: "In creating a legislative department and conferring upon it the legislative power, the people must be understood to have conferred the full and complete power as it rests in, and may be exercised by, the sovereign power of any country, subject only to such restrictions as they may have seen fit to impose, and to the limitations which are contained in the Constitution of the United States. The legislative department is not made a special agency for the exercise of specifically defined legislative powers, but is intrusted with the general authority to make laws at discretion."

Nothing, that is a proper subject for legislation, can properly be said to have been reserved to the people by implication. The Constitution passed all sovereign power not expressly retained or guaranteed by the constitution of the United States.

We have carefully examined many of the decisions bearing on this most interesting topic, and will now quote from some of the cases denying the doctrine of implied reservation of local self-government.

In *Mayor and Council of Americus* v. *Perry et al.,* 114 Ga. 871, 878, speaking for the court, Justice Cobbs says: "There is not in the constitution of this State any express guaranty of local self-government for municipal corporations. There is nothing in the constitution from which this right can be legitimately inferred. How far a community shall be allowed to control its own affairs is left to the judgment and discretion of the General Assembly." He also quotes approvingly from the dissenting opinion of Justice Mitchel, in *State ex rel.* v. *Denny, supra.*

The legislature of Texas passed an act rechartering the city of Galveston, changing its form of government, providing for a government by a commission consisting of five members, as in the case at bar, and further provided that two of them should be elected by the voters of the city, and three should be appointed by the governor. The act was assailed as unconstitutional, on the ground that it denied to the people of Galveston the right of self-government. The supreme court of that state upheld the act, and in its opinion declares that no right of local self-government, based on history or tradition, exists in a city, whereby the legislature is precluded from making the members of the governing body gubernatorial appointees. *Brown* v. *City of Galveston,* 97 Tex. 1.

*Philadelphia* v. *Fox,* 64 Pa. 169, holds that, "the legislature may modify the internal arrangement of a municipal corporation or destroy it;" and that it may "continue the existence of a municipal corporation and assume the appointment of all its officers."

Notwithstanding there is more reason for supposing that local self-government was impliedly reserved by the people of Rhode Island than by the people of most other states,

owing to the peculiar manner in which the settlements in Providence, Portsmouth and Newport were made, the people having purchased the lands from the Indians and established governments without a charter of any kind from the crown, yet it was said by the highest court of that state, in discussing the question of local self- government, in *The City of Newport* v. *Horton,* 22 R. I., at page 203: ".Whilst this subject is more historical than legal, we have considered it to this length simply to show that the broad claim made and so urgently pressed by the petitioners cannot be sustained to the extent of holding that the constitution of the State must be interpreted according to an unwritten theory of local self-government, which so entered into its provisions as to make it controlling in construing those provisions."

The Legislature of Ohio passed an act establishing boards of public affairs for cities of first grade of the first class, and authorized the governor to appoint the members of said boards. The supreme court held the act to be constitutional. *State ex rel. Herron* v. *Smith,* 44 Ohio St. 348.

In 1892 the legislature of North Carolina passed an act amending the charter of the city of Wilmington, providing for the election, by the people, of one alderman from each ward, and the appointment of one alderman in each ward by the governor. The constitutionality of the act was upheld by the court. *Harriss* v. *Wright,* 121 N. C. 172.

In addition to the foregoing, we cite the following authorities, some of which decide that no inherent right of local self-government exists, independent of express constitutional guaranty; and others determine principles which are at variance with the doctrine contended for: *Redell* v. *Moores,* 63 Neb. 219, overruling the earlier case of *State* v. *Moores,* reported in 55 Neb. 480, in which, by a divided court, the opposite view was taken; *Commonwealth* v. *Plaisted,* 148 Mass. 375; *Wulf* v. *Kansas City,* 77 Kan. 358; *Coyle* v. *McIntire,* 7 Hous. (Del.) 44; *Commissioners of Revenue* v. *State,* 45 Ala. 399; *Hunter* v. *City of Pittsburg,* 207 U. S. 161; *Ohio ex rel.* v. *Covington,* 29 Ohio 102; *State* v. *Rosenstock,* 11 Nev. 128; *David* v. *Portland,* 14 Ore. 98; *Gooch* v. *Exeter,* 70 N. H. 413; *Baltimore* v. *State,* 15 Md. 376; and *State* v. *Williams,* 68 Conn. 131.

We do not wish to be understood as saying that it is impossible for the legislature to exceed its legitimate powers, unless expressly restrained by the Constitution.   It is not omnipotent.   It can not, for instance, reverse a judicial decision, although it may repeal the law supporting such decision; neither can it take a citizen's property or levy taxes, for purposes purely private.   Because those things do not fall within the legitimate sphere of government.   That the legislature has not exceeded its power in passing the act in question, we think, is clear.   But if we entertained a doubt on the question, it would still be our duty to uphold the act.   A court exercises a very great power when it declares a law passed by the legislature to be void, and although its power to do so, in proper cases, is conceded, still it is a grave responsibility which the courts discharge with much delicacy.   When the constitutionality of an act is a doubtful question, the rule is to uphold the act.   Speaking for the court in *State ex rel. Dillon* v. *County Court,* 60 W. Va., at page 351, Judge POFFENBARGER says: "Statutes can not be overthrown by courts as unauthorized unless the want of power in the legislature to pass them is undoubted."   See, also, *Woodall* v. *Darst,* 71 W. Va. 350.

With the wisdom or propriety of the act, we have nothing to do.   Those are matters for the legislature alone to consider; it determines the public policy.   Our jurisdiction ends when we have determined the legislative power to exist.   If the legislature has made a mistake, it is a political one, and it alone can correct it.   It is the proper guardian of political rights; and the right to administer municipal government, as well as to create it, is purely a political right, not a natural one.

The privilege of electing their municipal officers is withheld from the citizens of Williamson for a limited time only. Relators are appointed to hold for a period of two years, and until the first election, provided for by the act, takes place. Their appointment may, therefore, well be regarded as provisional.   Having made the appointments, the governor's power to make further appointments is exhausted.   No purpose is shown by the act to further withhold from the people of the city the privileges usually granted to the citizens of

municipalities. Hence, even though we were of the opinion that the legislature could not withhold from the citizens the privilege of electing their officers, indefinitely, still it would be our duty to uphold the act, and the governor's appointments made thereunder, as being provisional. In this view we are supported by the opinion of Judge Cooley, in *People v. Hurlbut, supra,* who held that the act, in that case, did not unduly take from the people the right of local self-government, which he asserted as an inherent right in the people of Detroit.

Our conclusion leads to an affirmance of the judgments and decrees appealed from, and it will be so ordered.

*Affirmed.*

POFFENBARGER, JUDGE, *(dissenting):*

My dissent in these cases is founded upon the rules universally observed in the solution of constitutional questions other than the one now under consideration, but recklessly cast aside and ignored, I think, in every case in which the constitutional guaranty, to municipal corporations, of the right of self-government, respecting matters primarily or peculiarly local, has been denied. Much of the argument relied upon for justification of the holding merely combats propositions not set up in support of the claim of the guaranty nor at all necessary to maintenance thereof.

For instance, there is found in the opinions labored contention against the suggestion of inherent right of self-government. Nobody denies the power to clothe the legislature with unlimited authority over municipal corporations or territory within their boundaries. Certain natural rights, life, liberty and the pursuit of happiness, are regarded as being inherent and inalienable. To sustain the right of local self-government, under the constitutions of the states, (and, as concerns this question, they are all alike in substance), it is wholly unnecessary to put it in that class. It suffices to ascertain that the people, in adopting the constitution, intended to secure it to the inhabitants of the territory incorporated. The question is not what power the people could have vested in the legislature, but the nature and extent of

the power they did actually vest in it. Such a right is not one naturally or divinely inherent. Nobody predicates any naturally inherent right of public corporations, as an attribute. Nobody denies the artificial character and qualities of these organizations. Nobody asserts the right of local self-government is essential to a republican form of government. Likely it is not. All of these considerations lie beyond the borders of our inquiries, namely, the intent of the people, in the adoption of the constitution, the general nature and basic elements of a municipal corporation as contemplated by them, and the nature, elements and powers of a legislature, according to their knowledge and conception of it at that time. These terms in the constitution mean now what they meant then and their meaning at that time was, for the purpose of interpretation and construction, just what the masses understood it to be. The contemporaneous common knowledge of the subject, derived from tradition, history, literature, science and law, is the universally recognized test. On this phase of the discussion, the conclusion of the Supreme Court of the United States ought to be received anywhere as satisfactory authority. In *Gibbons* v. *Ogden*, 9 Wheat., 188, Mr. Chief Justice Marshall stated the proposition in these words: ''As men, whose intentions require no concealment, generally employ the words which most directly and aptly express the ideas they intend to convey, the enlightened patriots who framed our constitution, and the people who adopted it, must be understood to have employed the words in their natural sense and to have intended what they have said.'' The state courts, including our own, declare and enforce the rule with equal emphasis and vigor. *List* v. *Wheeling*, 7 W. Va. 519; *C. & O. Ry. Co.* v. *Miller*, 19 W. Va. 418; *State* v. *Harden*, 62 W. Va. 323; *Capito* v. *Topping*, 65 W. Va. 594; *May* v. *Topping*, 65 W. Va. 660; *Simms* v. *Daniel*, 49 W. Va. 563; *State ex rel. Nance & May* v. *Brown*, 71 W. Va. 523; *Ex parte Jones et al.*, 71 W. Va. 594; *State* v. *Mace*, 5 Md. 350; *Manly* v. *State*, 7 Md. 147; *Hills* v. *City of Chicago*, 60 Ill. 90; *Beardstown* v. *Virginia*, 76 Ill. 41.

Advocacy of the guaranty invokes nothing beyond the benefit of this universally recognized rule. Assertions of inherent right, occasionally found in the course of argument,

mean no more than that, as municipal corporations were known, at the date of the adoption of the constitution, local self-government was an invariable attribute or element thereof, just as a piston and a steam-chest are now known to be parts of steam engines, wheels necessary elements of wagons and foundations essential parts of houses. In that sense, it was literally and indisputably inherent. But nobody, I repeat, has ever so much as intimated lack of power in the people, to have provided in their constitution, for the creation of public corporations without such right.

The protest, found in some of the decisions, particularly *Redell* v. *Moores*, (Neb.) 55 L. R. A. 740, against resort to unwritten matter or principles for aid in constitutional construction, there denounced as the introduction of an undefined test, ''an elusive something, elastic and uncertain as an unwritten constitution,'' is equally fallacious. Nobody affirms the existence of an unwritten constitution. Nevertheless, it is impossible truthfully to assert that the constitution defines the terms ''legislature'' or ''municipal corporation,'' or specifically sets forth or prescribes the powers, functions or attributes of either. Nor can that instrument or any other be read intelligently, without application to its words, of the common knowledge of their meaning, disclosed by tradition, history, literature, science and law. No instrument is fully written. Under its terms, a mass of common knowledge which, if fully written, would multiply its length, sometimes into volumes, necessarily comes in for purposes of definition. The constitution, like every legal instrument, is written, only in the sense that its words generally and indefinitely cover its subject matter, but it is unwritten in the sense that its words must be defined by resort to common knowledge. In the latter sense, no constitution nor any other instrument is written. For the definitions of words and the nature of things the courts must draw upon the great reservoir of judicial knowledge of which they take notice, derived from human experience and witnessed by tradition and books which form no part of the instrument itself.

The implications, inferences and deductions, drawn from the language and provisions of the constitution, for support of the guaranty of local self-government, as defined by the

Michigan Supreme Court and others, are not different in character from those made use of upon other occasions of inquiry for the meaning or intent of the constitution. Nor do they differ in nature an iota from those upon which the assertion of unlimited legislative power stands. Legislatures have such powers as bodies of that kind have always possessed and exercised. In providing a legislature, by their constitution, the people are presumed to have intended to sanction and ordain a body with such powers as they historically knew the Parliament of England and all other national legislatures possessed, and to have it exercise those powers for them, except in so far as they saw fit, in that instrument, to limit or curtail that inherent power. This presumption is the sole basis of plenary power in the legislature. A denial of its power to do any ordinary legislative act, made at the bar of this or any other court, can be legally answered in no other way. A search of the constitution would reveal no provision specifically granting the power. To say the legislature has all legislative power not withheld from it by the constitution, without giving the reason for the assertion, would be as unsatisfactory as a mere declaration of the existence of the guaranty in question, unaccompanied by reason or authority for it. Like all other elements of civil government, legislative jurisdiction and authority are artificial. It is inherent in the law making body, not by force of any natural law, but because it is historically known to have been conceded or assigned to it, by mankind, throughout all the ages of civilized and enlightened government. For the definition of the legislature or the enumeration of its powers, the people, in adopting the constitution provided for it, did not resort to that instrument, but to their common knowledge of these subjects, derived from sources above mentioned; and the courts must likewise go outside of the instrument for the same information, when called upon to ascertain and declare the nature and extent of legislative authority. The meaning of the constitution, respecting these matters as well as all others, is the intention of the people of the state, in the adoption thereof. In construing the constitution as a whole, or any provision of it, as to any matter not made plain and certain by its terms, the courts must look beyond it and take into consideration, as guides to the

intention, all of that common knowledge of the subject in the light of which the people framed and adopted the provision in question, just as in the case of the construction of any other instrument.

That which makes it necessary to go beyond the specific provisions of the constitution to find legislative power, amply justifies resort to extrinsic evidence for the definition and meaning of express terms, provisions and purposes that may, when properly understood, that is, as the people understood them, restrain or limit powers expressly or impliedly conferred upon the legislature, or regulate the exercise thereof. No provision of our constitution expressly authorizes the legislature to charter a municipal corporation. To get it at all, we must go beyond the letter of the instrument, as I have suggested. If, when found, it has a limitation fixed upon it by terms in the constitution, defined by extrinsic evidence of the same character as that by which the existence of the power itself is disclosed, there can be no justification for allowance of the one without the other. They are of equal dignity and force. Neither is fully or specifically written in the constitution. Both are, in a legal sense, sufficiently written in it—written in the manner and to the extent characteristic of statutes, contracts, wills, treaties and all other instruments. Sound rules work both ways. A constitution disallowing such operation warps and misuses the rule. Legislatures are no older nor better defined, legally, historically or scientifically, than municipal corporations. Each has its vital and distinctive characteristics and functions. Each is an agency of the state. Neither is the state. Nor is the corporation any more a legislative agent than is a court the legislature has constitutional power to create. Each has governmental functions, that of the legislature being general and that of the municipal corporation local. One wields the law making power of the state, the other the power of local government, under legislative regulation. From the earliest dawn of Anglo-Saxon civilization and English jurisprudence, municipal corporations have had the power of local self-government. Deprivations of that right by English kings were regarded by the English people and Parliament as acts of tyranny and despotism and constituted, in part, the basis of

a revolution which dethroned King James. No authority in
the legislature beyond that of creation, regulation and abroga-
tion, had ever been asserted in England or America, prior
to the adoption of the constitution of this state. As municipal
corporations were then known, the right of self-government
was historically, politically and economically inherent in
them. As a legislature was then known, it had like inherent
power, among other innumerable things, to charter, regulate
and abolish corporations, having the right of local self-
government. To say it had any kind of power to charter,
regulate and abrogate corporations not having such right is
mere assumption, unsustained by anything in common knowl-
edge. Not found in the words of the constitution nor in
common knowledge, there is no basis for the assertion that it
is inherent in the legislature. It had no existence, wherefore
the people could not have known it, when they adopted the
constitution, and, for the same reason, it has no place, as an
element or factor, in the inquiry for the popular intent. On
the other hand, they knew no legislature had ever assumed
authority to create a corporation without power of self-
government and that no existing corporation lacked such
power. Presumptively, therefore, in saying "The legislature
may, by law, authorize the corporate authorities of cities,
towns and villages, for corporate purposes, to assess and col-
lect taxes;" and, in limiting the legislative power respecting
the mode and manner of incorporating cities, towns and
villages and amending their charters, by a clause of sec. 39
of Art. VI, the people assumed the corporate authorities
would have the essential character of existing corporate
authorities and that the cities, towns and villages to be in-
corporated would be such in general character as had, up to
that time been created, not things lacking the historically
politically and economically vital and basic elements of a
municipal corporation. Of course, this view rests upon im-
plication to some extent, but the implication has root and basis
in the terms of the constitution. Almost every other con-
clusion, as to constitutional intent has a like basis. That this
one depends upon implication in a large degree or to a greater
extent than do some others, can make no difference. That one
man distributes more of his weight to his heels, in walking,

than another, is consistent with the view that each walks on his feet. Regardless of detail results, the principle rules in all cases. Just here it may be truthfully repeated that the particular power here claimed for the legislature does not have even so much as a partial foundation in implication. It stands solely upon judicial assertion.

It is the province of the people, not of the courts nor the legislatures, to make constitutions and, after they have been made, they are not to be construed according to mere legislative or judicial notions or conceptions of right or policy. The test of meaning is the popular intent at the date of the adoption of the instrument, not some other date. An unwritten constitution may grow, expand and contract, but a written constitution cannot. It means the same always. For its meaning, we must go to the time of its adoption. Knowing what a West Virginia municipal corporation was, in 1872, we know what kind the people intended to entrust with the exercise of the power of taxation. Their intention then is the law of the constitution now. Hence, it is wholly immaterial that a few state courts have recently voiced a different conception of the nature and functions of such organizations. That conception did not enter into or influence the conduct of the makers of our constitution, wherefore it should not be allowed to influence us upon the inquiry for its true meaning.

Speaking of the federal constitution, in *Dred Scott* v. *Sandford,* 19 How. (U. S.) 393, Mr. Chief Justice Taney said: "It is not only the same in words, but the same in meaning, and delegates the same power to the Government, and reserves and secures the same rights and privileges to the citizens; and as long as it continues to exist in its present form, it speaks not only in the same words, but with the same meaning and intent with which it spoke when it came from the hands of its framers, and was voted on and adopted by the people of the United States. Any other rule of construction would abrogate the judicial character of this court, and make it the mere reflex of the popular opinion or passion of the day." In *South Carolina* v. *United States,* 199 U. S. 437, Mr. Justice Brewer, citing the Dred Scott case and quoting the language here taken from it, reiterated the doctrine in these

terms: "The Constitution is a written instrument. As such its meaning does not alter. That which it meant when adopted it means now. Being a grant of powers to a government its language is general, and as changes come in social and political life it embraces in its grasp all new conditions which are within the scope of the powers in terms conferred. In other words, while the powers granted do not change, they apply from generation to generation to all things to which they are in their nature applicable. This in no manner abrogates the fact of its changeless nature and meaning. Those things which are within its grants of power, as those grants were understood when made, are still within them, and those things not within them remain still excluded."

Read in the light of the firmly established rules giving paramount force to the intention of the people and determining methods of ascertaining it, the arguments of the judges of the Michigan court, in *People* v. *Hurlbut*, 24 Mich. 44, are unanswerable. At page 88, Chief Justice Campbell said: "Incorporated cities and boroughs have always, both in England and in America, been self-governing communities within such scope of jurisdiction as their charters vest in the corporate body. According to the doctrine of the common law, a corporation aggregate for municipal purposes is nothing more or less than 'investing the people of the place with the local government thereof.'—Salk. 193. In the absence of any provision in the charter creating a representative common council, the whole body of freemen make the common council, and act for the corporation at their meetings.—*Comyn Dig. 'Franchises*, (F.) 25. It is agreed by historians that originally all boroughs acted in popular assembly, and that the select common council was an innovation, which may have been of convenience or by encroachment. In modern times cities have generally acted in ordinary matters by such a select body. But townships still act by vote at town meetings, and for many purposes connected with taxation the people of cities usually have the same privilege. But whether acting directly or by their representatives, the corporation is, in law, the community, and its acts are their acts, and its officers their officers. The doctrine is elementary that all corporation officers must derive office from the corporation.—Kyd, ch. 3,

§ 8.   This has been from time immemorial settled law.   By
articles fifteen and sixteen of the great charter, it was stipu-
lated that the liberties and free customs of London and all
other cities, boroughs, towns and ports should be preserved.
Those liberties were all connected with and dependent upon
the right to choose their own officers and regulate their own
local concerns.   The sole motive of the infarmous proceedings
of Charles II. to procure the forfeiture of these corporate
charters, was to enable him to interfere in the selection of
corporate officers.   When he had secured a decision against
the city of London, adjudging the charter forfeited on
trumped up charges of sedition and illegal tolls, he offered,
through Lord North, to respite the judgment, if the city
would give him such right of control over its election of
officers as to enable him to exclude persons not acceptable
to the Crown.—8 *State Trials*, 1281; *Lives of Lord Chancellors
Vol. 4 p. 3*8-19*.   These interferences with both the English
and American colonial charters were always regarded as legal
outrages, and contrary to all constitutional principles, and
one of the first acts of parliament, after the revolution of
1688, was passed to prevent any future action of that kind.''

In those jurisdictions in which the right of self-government
is recognized and placed beyond legislative abrogation, the
courts carefully mark the distinction between corporate juris-
diction over purely local matters and such jurisdiction over
matters of a general public nature, conceding legislative
power to commit the latter to the care of officers and boards
not selected by the inhabitants of the corporation, and some
of the decisions relied upon as authority so to treat matters
of purely local concern go no further than the divestiture of
corporate control of police and fire officers and tribunals.
Such is the character of the decision in *Newport* v. *Horton,* 22
R. I. 196, which involved only a police officer.   In its opinion,
the court indicated its entire satisfaction with the doctrine of
the Michigan cases.   The following excerpts from the opinion
disclose the court's attitude:   ''Towns and cities are recog-
nized in the constitution, and doubtless they have rights which
cannot be infringed.   *   *   *   We assume that the towns
and cities in this State have the same rights which towns and
cities have in other States under the prevalent form of State

government. One inquiry, therefore, is whether the establishment of police authorities by the State infringes the rights of self-government. * * * The clear weight of authority sustains the right of the legislature to control police, and equally is it sustained by sound reason.'' The opinion concludes with this quotation from the opinion of Judge Staples in *Burch* v. *Hardwicke,* 30 Gratt. 38: ''The distinction recognized in all of them is between officers whose duties are exclusively of a local nature and officers appointed for a particular locality, but yet whose duties are of a public or general nature. When they are of the latter character they are State officers, whether the legislature itself makes the appointment or delegates its authority to the municipality. The State, as a political society, is interested in the suppression of crime and in the preservation of peace and good order, and in protecting the rights of persons and property. No duty is more general and all-pervading than this. It extends alike to towns and cities as to the country. It looks to the preservation of order and security in the State, at elections, and at all public places; the protection of citizens at railway stations, at steamboat landings; the enforcement of the law against intemperance, gambling, lotteries, violations of the Sabbath, and, in fine, the suppression of all those disorders which affect the peace and dignity of the State and the security of the citizen. The instrumentalities by which these objects are effected, however appointed, by whatever name called, are agencies of the State, and not of the municipalities for which they are appointed or elected. 'The whole machinery of civil and criminal justice,' says a learned judge, 'has been so generally confined to local agencies that it is not strange if it has sometimes been considered of local concern. But there is a clear distinction in principle between what concerns the State and that which does not concern more than one locality.' ''

The larger number of cases cited in support of the majority opinion fall far short of the proposition accepted by it, in so far as they actually decide anything. *Baltimore* v. *Howard et al.,* 15 Md. 376, involved only State control of the police. *Gooch* v. *Exeter,* 70 N. H. 43, involved the same question. *Rev. Com.* v. *State,* 45 Ala. 407, involved only the State's

power of taxation. *Con* v. *Plaisted,* 148 Mass. 375, involved only a police regulation prescribed by a police board appointed by the governor. *Hunter* v. *City of Pittsburgh,* 207 U. S. 161 merely denies the existence of any federal question in a contest between the legislature and a municipal corporation. *Wulf* v. *Kansas City,* 77 Kan. 358; *David* v. *Portland Water Com.,* 4 Ore. 98; *Harris* v. *Wright,* 121 N. C. 172; *Brown* v. *Galveston,* 97 Tex. 1; *Americus* v. *Perry,* 114 Ga. 871; *Phila.* v. *Fox,* 64 Pa. St. 169, and *State* v. *Smith,* 44 O. St. 348, all support the opinion. Against it stand express decisions in Indiana, Iowa, Michigan, Alabama, Illinois, Kentucky, Tennessee and North Dakota. The weight of authority, therefore, seems clearly to be against the assumption of right in the legislature to deprive public corporations of the right of local self-government, notwithstanding Judge Dillon's view of the situation. His great ability I cheerfully confess, but I cannot ascribe to him legal infallibility as an attribute.

The conclusion adopted by the court leaves the legislature wholly unrestrained. It may turn over to appointees of the Governor every municipal corporation in the state, if it sees fit to do so, and such appointees need not be residents of the corporations they are to govern. Citizens of Huntington may be made rulers of Charleston and citizens of Charleston rulers of Huntington. The government of all the cities may be entrusted to citizens of the rural sections. None of these things are likely to happen, of course, but a construction making them possible is violative of the rules of interpretation. An absurd or ridiculous possibility of result always condemns the construction. "But, as in the case of statutes, this rule, (that plain provisions must be allowed full effect, without regard to consequences), extends only so far as the language of a constitutional provision is plain and unambiguous, * * * and where, understood in that sense, it raises no conflict with other provisions in the same instrument, and gives occasion to no absurd effect. An intention to produce such results cannot, of course, be imputed to the framers of a constituion, or to the people adopting it, any more than to the Legislature in passing a statute. And hence, to avoid them, aids in the construction of constitutional pro-

visions are recognized as permissible, anologous to those allowed in the construction of statutes.'' Endlich, Int. Stat., sec. 509. See *Hasson v. City of Chester,* 67 W. Va. 278; *Ex parte Jones,* 71 W. Va. 567, 605, and *Peyton v. Holley,* 72 W. Va. 540, 542.

Can anything be more obvious, as a matter of reason, than that the people would have provided safe-guards against such results as are here suggested as being possible, if they had realized that, in adopting the constitution, they were clothing the legislature with power to take away from the people of the cities, towns and villages, the right of self-government they then held? The omission thereof proves lack of intent to give such power. Of course, this invokes the force of implication, but it is utterly impossible to interpret the constitution without resort to implications. What prevents the legislature from providing appointed commissioners to govern the counties and districts? Words of express prohibition thereof cannot be found in the constitution. It comes only from implication. Almost all of the restraints upon legislative power are implied, just as almost all the power it has rests upon implication. Of course some implications are stronger than others, but that does not affect the principle. To uphold a particular view in a particular line of policy the courts which deny right of corporate local self-government are forced wholly to disregard the principle, in one aspect, and to stand upon it, in another. Such construction cannot be sound.

The legislature is entitled to the benefit of all doubts as to the extent of its authority, but whether there is a doubt, in a given instance, depends upon the result of the application of the settled rules of interpretation, in the quest for the meaning of the constitution. A doubt arising from failure to apply the rules is legally no doubt at all, and does not bring the court within the protection of the doubt rule. Observance of the rules, upon this inquiry, leads to an absolute certainty of lack of the power the legislature has assumed.

Nor can the act be upheld as one authorizing provisional appointments. It puts the appointees in for two years, if it puts them in at all. If they should be admitted, they cannot retire, after having organized the new government, without

creating vacancies for the filling of which the act makes no
provision.   There is no local appointing power, nor anybody
authorized to call an election.   The only ground of justifica-
tion of provisional appointments, suggested by any authority,
is the possible necessity, under conceivable conditions, of en-
trusting the preliminary work of organization or installation
to men peculiarly qualified for it.   In such cases, the legisla-
ture has no power to put them in by appointment for a
longer period than is necessary to the performance of such
work.   They must get out the moment it is completed.   Such
was the opinion of Judges Cooley and Christiancy in *People*
v. *Hurlbut,* 24 Mich. 44.   The other two judges denied legisla-
tive authority to make provisional appointments at all.   The
terms specified in the act held unconstitutional in the
Michigan case were two, four, six and eight years.   No mem-
ber of the court thought any of the officers could serve
throughout the specified term.   Judge Cooley said: ''The
excess of authority was only in providing that the appoint-
ments made should continue for two, four, six and eight years.
\*   \*   \*   If the exact period for the cessation of their official
functions was not named, we must suppose the legislative pur-
pose to have been that the common council, to whom had been
given 'the power to fill vacancies, should proceed to do so
whenever in their view the functions of the provisional board
had been fulfilled.   From that time the provisional in-
cumbents could rightfully occupy only till appointees were
named by the board possessing the general power to appoint.
I think the position of this case is precisely the same that
it would have been if the act were as I have supposed.''   By
this, he meant the appointees were legally in the same situa-
tion as if no terms had been prescribed.   A later Michigan
case, *Moreland* v. *Millen,* 85 N. W. 882, held unconstitutional
a statute providing for an appointment to the office of super-
intendent of public works, for a period of about a year, and
expressly declaring it to be provisional.   These are the only
decisions found that discuss at any length the suggestion of
provisional appointments and they are squarely contradictory
of the position taken in the majority opinion.   Aside from
authority, we know, as a matter of common knowledge, there
was no exigency requiring these appointments to be made for

two years. Except as to the number and official titles of the governing officers and their terms of office, the new form of government is not radically different from the old. The corporate powers are substantially the same. Williamson had been governing itself for years. Municipal government was not a new or intricate problem for its citizens. Moreover, there was abundant time between the passage of the act and July 1, 1915, for the election of the commissioners. The legislature could not make occasion for a provisional government by its own failure to provide for a preliminary election, in the manner in which it has so often done that. As the act took effect, May 9, there was ample time between that date and July 1, for an election.